**UNITED STATES of America,**
**Plaintiff,**

v.

**Bernardo Cuellar BACA et al.,**
**Defendants.**

Nos. *14656, 14964, 15803, 15850, 15813, 15991, 14344, 15410, 16245, 15666, 15463, 15847, 15046, 15650, 16360, 15606, 15651.*

United States District Court,
S. D. California.

Dec. 5, 1973.

---

9. See The Civil Rights Cases, 109 U.S. 3, 25, 3 S.Ct. 18, 31, 27 L.Ed. 835 (1883).

Harry D. Steward, U. S. Atty. by James Meyers, Asst. U. S. Atty., San Diego, Cal., for plaintiff.

Federal Defenders of S. D. Inc. by John Cleary, San Diego, Cal., for defendants: Charles Earl Benson, Chalmer Lynn Carter, Anacleto Nava-Bibayoff, Camilo Juarez-Rodriguez, Adela Solorio Juarez, Gloria May Gilmore, Bernardo Cuellar Baca, Donald James Pennington, James R. Thompson, Lucero Alberto Escalante, Joe Valdivez Luna, Peter Michael Roundrup, Luis Antonio Ortiz.

Anthony S. Deutsch, San Diego, Cal., for Peter Frederick Sackrider and Scott Eugene Atkinson.

Kevin J. McInerney, San Diego, Cal., for Laura Elena Esquer-Rivera and Norman Richard Lindsay.

Ron Romines, Menlo Park, Cal., for Philip Luther Omdahl.

Michael S. Evans, San Diego, Cal., for Dennis James Rich.

George Haverstick, San Diego, Cal., for Michael Alfred Ray.

Frederick L. Darvey, Los Angeles, Cal., for Louis Michael Kuljis.

## OPINION

TURRENTINE, District Judge.

On June 21, 1973, the United States Supreme Court ruled in Almeida-Sanchez v. United States, 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973) that a "roving search" of an automobile, without a warrant and without probable cause, when not a border search, or the functional equivalent thereof, violated the Fourth Amendment to the United States Constitution. Thereafter, the Ninth Circuit remanded cases to this and other districts for "consideration of the impact of Almeida-Sanchez. . . ." E. g. United States v. Cuellar Baca, Slip No. 73–2048 (Sept. 10, 1973). Presently there are well in excess of 20 cases pending in this District either on remand from the Circuit or upon original hearing raising constitutional questions left open by Almeida-Sanchez.

On October 21, 1973, the judges of the United States Federal District Court for the Southern District of California in General Order 176 ordered that a comprehensive factual hearing be held to evaluate the consequences, if any, of Al-

*meida-Sanchez* on the checkpoints operated by the Border Patrol within this District. All cases in this District raising this issue were consolidated on a voluntary basis.

Subsequently, on November 19, 20 and 21, this Court held hearings wherein the interested parties presented evidence on this question. This Court, it should be noted, did not include in its deliberations the issue of *Almeida-Sanchez'* retroactivity.

Based upon that hearing and the extensive evidence submitted, the Court files the following opinion.

## THE ILLEGAL ALIEN PROBLEM

■ The United States through legislative action has determined that it is in the best interest of the nation to limit the number of persons who can legally immigrate into the country in any given year. These controls reflect in part a Congressional intent to protect the American labor market from an influx of foreign labor. Karnuth v. United States, 279 U.S. 231, 49 S.Ct. 274, 73 L.Ed. 677 (1929); § 201(a) of the Immigration and Nationality Act of 1952, 66 Stat. 163, as amended by the Act of October 3, 1965, 79 Stat. 911, 8 U.S.C. § 1151(a).

Under this policy of limited admission, 385, 685 new immigrants entered the United States legally during fiscal year 1972. Since July 1, 1968, the law has established an annual quota of 120,000 persons for the independent countries of the Western Hemisphere. Included within this quota are immigrants from the Republic of Mexico who in fiscal year 1972 totalled 64,040. 1972 Annual Report, Immigration and Naturalization Service, p. 2, 28.

Currently illegal aliens are in residence within the United States in numbers which, while not susceptible of exact measurement, are estimated to be in the vicinity of 800,000 to over one million. Department of Justice, Special Study Group on Illegal Immigrants from Mexico, A Program for Effective And Humane Action on Illegal Mexican Immigrants, 6 (1973), [hereinafter cited as *Cramton Rpt.*].

Of these illegal aliens, approximately 85 percent are citizens of Mexico. *Cramton Rpt.* at 6. They are industrious, proud and hard-working people who enter this country for the purpose of earning wages, accumulating savings, and returning or sending their savings home to Mexico.

Since 1970, the number of illegal Mexican aliens in the United States who have been apprehended has been growing at a rate in excess of 20 percent per year. *Cramton Rpt.* at 6.

The increasingly large numbers of Mexican nationals seeking to illegally enter this country reflects the substantial unemployment and underemployment in Mexico—fueled by one of the highest birth rates in the world. Moreover, Mexican employment statistics are not likely to improve dramatically since fully 45 percent of Mexico's population is under 15 years of age and, therefore, will soon be attempting to enter the labor market.

Further prompting Mexican nationals to seek employment in the United States is the fact that there is a significant disparity in wage rates between this country and Mexico. In Mexicali and Tijuana, both Mexican cities bordering the Southern District and each with a population in excess of 400,000, the average daily wage is about $3.40 per day. The minimum wage is even lower for workers in the interior of Mexico. The average worker in Mexico, assuming he can find work, earns in a day as much as he can make in only a few hours in the United States.

In addition, it is estimated that the per capita income of the poorest 40 percent of the Mexican population, the strata most likely to leave their homeland in search of employment in the United States, is less than $150 per year.

The manpower needs of the United States generated by World War II result-

ed in many Mexicans being imported into this country and becoming familiar with employment opportunities and practices in the United States. See Diaz v. Kay-Dix Ranch, 9 Cal.App.3d 588, 88 Cal. Rptr. 443 (1970).

The opportunities available to Mexican aliens have traditionally been in agriculture. While still true in many parts of the United States Southwest, in recent years the pattern has changed and more and more illegal aliens are obtaining employment in the service and manufacturing sectors of our economy. These aliens are increasingly found in virtually all regions of the country and in all segments of the economy. State Social Welfare Board, Issue: Aliens in California, 12 (1973) [Hereinafter cited as *Aliens in California*].

The nature of the change in employment opportunities available is demonstrated by one estimate that 250,000 illegal aliens are employed in Los Angeles County where agricultural opportunities are known to be limited. Hearings on Illegal Aliens Before Subcomm. No. 1 of the House Comm. on the Judiciary, 92d Cong., 1st Sess., pt. 1, at 208 (1971) [Hereinafter cited as *Hearings on Illegal Aliens*].

Other estimates of the impact of illegal aliens in California suggest that in 1971, when 595,000 Californians were unemployed (7.4 percent of the State's labor force), there were between 200,000 and 300,000 illegal aliens employed in California earning approximately $100 million in wages. *Hearings on Illegal Aliens* at 150.

Since the majority of Mexicans are unskilled or low skilled workers they tend to compete with Mexican-Americans, blacks, Indians, and other minority groups who, due to the declining percentage of jobs requiring low or no skills, are finding it increasingly difficult to obtain gainful employment. *Cramton Rpt.* at 12.

Illegal aliens compete for jobs with persons legally residing in the United States who are unskilled and uneducated and who form that very group which our society is trying to provide with a fair share of America's prosperity.

In addition, illegal aliens tend to perpetuate poor economic conditions by frustrating unionization, especially in such occupations as farm work.

Illegal aliens pose a potential health hazard to the community since many seek work as nursemaids, food handlers, cooks, housekeepers, waiters, dishwashers, and grocery workers. Immigration and medical officials in Los Angeles, for example, have discovered that the illegal alien population in Los Angeles' barrio is infected with a high incidence of typhoid, dysentery, tuberculosis, tapeworms, venereal disease and hepatitis. *L.A. Times*, Sept. 16, 1973, pt. II, at 1.

In some states illegal aliens abuse public assistance programs. In some instances entire families who entered the country illegally have been admitted to the welfare rolls. *Aliens in California* at 35, 43.

Another aspect of the problem created by illegal aliens is that employed aliens tend to send a substantial portion of their earnings to relatives or friends in Mexico. This outflow of United States dollars exacerbates our balance of payments problem to the extent of $1 billion a year. *Hearings on Illegal Aliens*, pt. 3 at 683.

The net effect of this silent invasion of illegal aliens from Mexico is suffering by the aliens who are frequently victims of extortion, violence and sharp practices, displacement of American citizens and legally residing aliens from the labor market, and irritation between two neighboring countries.

### THE LAW ENFORCEMENT PROBLEM

Given that illegal aliens are a significant problem in American life, especially for those minority groups who are described as economically deprived, and that Congress has decreed that all but a relatively few aliens are to be permanently excluded, we must then analyze

what law enforcement problems exist. In this regard, the following findings of fact are made:

The illegal alien problem is one found primarily in the Southwestern Region of the United States.

This problem along the Mexican-American border has existed for some time with the original responsibility for securing the integrity of the border being assigned to the U.S. Army, along with the Departments of Treasury and Labor, who had about 20,000 men assigned to the border between Brownsville, Texas, and San Diego, California, in 1920. National Geographic Magazine, "Along Our Side of the Mexican Border." (July 1920).

Currently the burden of controlling the entry of aliens and stemming the flow of illegal aliens along the Mexican-American border is assigned to the INS.[1]

This border extends for almost 2,000 miles from the Gulf of Mexico to the Pacific Coast.

Along this border there were over 152 million legal entries at authorized ports of entry during fiscal 1972, of which over 91 million were made by aliens. Over 39 million of the legal entries were made at the three ports of entry in Southern California (Calexico, San Ysidro and Tecate) of which over 24 million were made by aliens. Immigration and Naturalization Service, 1972 Annual Report, 25.

Of these entries made by aliens, the large portion were made by visitors with official permission to enter the country who had been issued temporary "border passes" such as I-186 cards (issued to residents of Mexico), which authorize the holder to travel within an area no further than 25 miles from the border and for a period of time not to exceed 72 hours. See 8 C.F.R. § 212.6.

These temporary border passes (I-186) are issued to simplify procedures needed for entry, and the issuing process recognizes the inter-relationship of contiguous communities along both sides of the border. *Hearings on Illegal Aliens*, pt. 1, 192.

In fiscal 1973 approximately 208,000 I-186 cards were issued and it is estimated that over two million such cards are currently in circulation. *Hearings on Illegal Aliens*, pt. 1, 173.

Within the INS, the U.S. Border Patrol, which was first established in 1924, has the primary function of preventing the illegal entry of aliens and the apprehension of those who have entered illegally and those who smuggle these illegal entrants.

The Border Patrol has approximately 1,700 agents, who are well-trained law enforcement officers, and of these about 80 percent are assigned along our southern border with Mexico.

A "deportable alien" is a person who has been found to be deportable by an immigration judge, or who admits his deportability upon questioning by official agents.

The number of deportable aliens apprehended by the Border Patrol (which makes the great majority of apprehensions) nationally has grown from 38,861 during fiscal 1963 to 498,123 in fiscal 1973; of this number 128,889 were found by Border Patrol agents working in the Chula Vista sector which includes 70 miles of the border in San Diego County, and 23,125 were located by agents in the El Centro sector which includes the Imperial County of California and 75 miles of the Mexican-American border.

The Border Patrol agents have the power to apprehend illegal aliens since by regulation the Attorney General has designated Border Patrol agents to be immigration officers and authorized them to exercise powers and duties as such officers [8 C.F.R. § 103.1(i)]; immigration officers by statute § 101(a)(17) of the Immigration and Nationality Act of 1952, 66 Stat. 163; as amended by the

---

1. The notation "INS" when used herein has reference to the Immigration and Naturalization Service.

Act of October 3, 1973, 79 Stat. 911, 8 U.S.C. § 1101(a)(17), are empowered, without a warrant, to stop and interrogate any alien or person believed to be an alien as to his right to remain or to be in the United States. See Au Yi Lau v. I. N. S., 144 U.S.App.D.C. 147, 445 F.2d 217 (1971), cert. denied, 404 U.S. 864, 92 S.Ct. 64, 30 L.Ed.2d 108.

Sec. 287(a)(3) of the 1952 Immigration Act provides authority for an immigration officer within a reasonable distance from the border of the United States to board and search any conveyance or vehicle; "reasonable distance" as used in that section of the Act means within 100 air miles from any external boundary of the United States, 8 C.F.R. § 287.1(b).

Immigration officers also are authorized to conduct inspection of aliens seeking admission or readmission to, or the privilege of passing through, the United States, and also are authorized and empowered to board and search any vehicle or like conveyance in which they believe aliens are being brought into the United States. Sec. 235(a) of the 1952 Immigration Act, 8 U.S.C. § 1225(a).

The deployment of Border Patrol agents along the border is intended to maximize the effectiveness of the limited number of personnel, with the first line of defense being called the "line watch." The line watch consists of agents being placed immediately upon the physical boundary where experience has shown that large numbers of illegal aliens can be detected attempting entry. A large number of agents so assigned are primarily concerned with responding to sensor alarms (electronic detection equipment) which are located at strategic positions. These agents also respond to citizen complaints concerning the suspected presence of deportable aliens.

In fiscal 1973, there were 175,511 deportable aliens apprehended throughout the nation by agents assigned to the line watch, with 69,147 being apprehended in the Chula Vista sector and 5,908 in the El Centro sector.

While the Border Patrol would like to apprehend all deportable aliens right at the border by agents on the line watch, inspections at regular points of entry are not infallible and illegal crossings at other than legal ports of entry are numerous and recurring. The maintenance of continuous patrol over the vast stretches of the border in Southern California is physically impossible, since the approximately 145 miles of boundary creates geographic barriers to effective patrol and man-made devices such as fences and electronic devices are in large part ineffective.

Increased manpower on line watch would not make that activity appreciably more effective as was demonstrated in 1969 during "Operation Intercept" when many more agents were stationed immediately on the border, and yet, the number of illegal aliens apprehended by agents operating inland was not significantly different from like periods when such additional manpower was not located at the boundary.

Once the aliens negotiate their way through the port of entry or, as is most common, walk across the border at a place other than an official port of entry, they find transportation inland either in public conveyances, or private vehicles with increasing numbers being transported by professional smugglers. A few have been known to walk some distance inland and have been apprehended after having walked as far north as Julian, California, which is over 60 miles from the border.

After crossing the line watch some illegal aliens seek employment in the Southern District, but the vast majority attempt to proceed to Los Angeles County and points north.

Once the illegal alien gets settled in a big city far away from the border it becomes very difficult to apprehend him, and therefore, the Border Patrol attempts to contain the illegal entrant within this district. *Aliens in California* at

7. With this objective in mind, they have (pursuant to their statutory authority discussed above) established, since at least 1927, strategically located traffic inspection facilities; commonly referred to as checkpoints, on highways and roads, for the purpose of questioning vehicle occupants believed to be aliens, as to their right to be, or to remain, in the United States, and also to search such vehicles for illegal aliens. Immigration and Naturalization Service Border Patrol Handbook 9-1 (1972) [hereinafter cited as *Handbook*].

The primary objective of the checkpoints is to intercept vehicles or conveyances transporting illegal aliens, or nonresident aliens admitted with temporary border passing cards (I-186), with particular attention being paid to vehicles operated by smugglers or transporters destined for inland cities in violation of 8 U.S.C. § 1324.

The selection of the location of a checkpoint is determined by factors relevant to the interdiction or interception of deportable aliens who have succeeded in gaining entry in an unlawful manner or are proceeding beyond the immediate border area in violation of conditions of their admission as border crossers, 8 C.F.R. § 212.60. The primary factors in selecting a checkpoint site are:

1. A location on a highway just beyond the confluence of two or more roads from the border, in order to permit the checking of a large volume of traffic with a minimum number of officers. This also avoids the inconvenience of repeated checking of commuter or urban traffic which would occur if the sites were operated on the network of roads leading from and through the more populated areas near the border.

2. Terrain and topography that restrict passage of vehicles around the checkpoint, such as mountains, desert, and, as in the case of the San Clemente checkpoint, the Camp Pendleton Marine Base.

3. Safety factors: an unobstructed view of oncoming traffic, to provide a safe distance for slowing and stopping; parking space off the highway; power source to illuminate control signs and inspection area, and bypass capability for vehicles *not* requiring examination.

4. Due to the travel restrictions of the I-186 nonresident border crosser to an area 25 miles from the border (unless issued additional documentation) the checkpoints, as a general rule, are located at a point beyond the 25 mile zone in order to control the unlawful movement inland of such visitors.

Strategic sites that meet the foregoing enumerated criteria are selected for "permanent checkpoints." These are sites equipped to handle a large volume of traffic on what would be a 24-hour basis except in case of manpower shortage, poor weather, or where traffic becomes excessive causing a potential safety hazard. *Handbook* at 9-3.

Other traffic checkpoints, known as "temporary checkpoints" are maintained on roads where traffic is less frequent. The placement of these sites will be governed by the same safety factors as involved in permanent site placement and are usually located where the terrain allows an element of surprise. Operations at these temporary checkpoints are set up at irregular intervals and intermittently so as to confuse the potential violator. *Handbook* at 9-3.

When the checkpoints, whether permanent or temporary, are in operation, an officer standing at the "point" in full dress uniform on the highway will view the decelerating oncoming vehicles and their passengers, and will visually determine whether he has reason to believe the occupants of the vehicle are aliens (i. e., "breaks the pattern" of usual traffic). If so, the vehicle will be stopped (if the traffic at the checkpoint is heavy, as at the San Clemente checkpoint, the vehicle will be actually directed off the highway) for inquiries to be made by the agent. If the agent does not have reason to believe that the vehicle approaching the checkpoint is carrying aliens, he may exchange salutations, or

merely wave the vehicle through the checkpoint.

If, after questioning the occupants, the agent then believes that illegal aliens may be secreted in the vehicle (because of a break in the "pattern" indicating the possibility of smuggling) he will inspect the vehicle by giving a cursory visual inspection of those areas of the vehicle not visible from the outside (i. e. trunk, interior portion of camper, etc.).

At the point of location of the sites now in regular use few aliens have reached the locale on foot, with 99 percent having entered a vehicle of one type or another. Approximately 12 percent of all apprehensions of deportable aliens throughout the nation are made at checkpoints.

In the United States, during fiscal 1973, approximately 55,300 deportable aliens were apprehended by Border Patrol agents working traffic checking operations. In the Chula Vista sector the number for that period was 21,232, while in the El Centro sector the total was 3,825.[2] During fiscal 1973, a total of 4,975 of the above were visitors apprehended at the checkpoints and a majority of these were those who were in violation of the terms of temporary border passes (Form I–186).

The placement of the checkpoints and their operations are coordinated between the two sectors located in this district and with Border Patrol activities to the east in Arizona. In actual operation the checkpoints, be they "permanent" or "temporary," have the same basic accouterments. Typically, about one-half mile to one mile south of the checkpoint is the first notification that the checkpoint is ahead. The notice is in the form of a black on yellow sign indicated "STOP AHEAD" which has floodlights for nighttime illumination, *Handbook* at 9–9. Next, about 200 yards from the checkpoint is another sign cautioning the traffic to slow down or to be careful; this sign usually has flashing yellow lights attached. For the 50 yards directly south of the checkpoint there are placed traffic cones evenly spaced along each side of the highway. The actual checkpoint has a sign indicating to the traffic to stop, with official Border Patrol vehicles parked on each side of the stop zone showing the official Border Patrol emblem and/or the designation U.S. OFFICERS. At this point the agents assigned at the "point," in their official uniform, conduct checking and inspection operations. Beyond the checkpoint is usually a sign indicating "THANK YOU."

While a large number of apprehensions are made at the checkpoints each year, as related above, the primary reason for their operation is that they effectively deter large numbers of aliens from illegally entering the country or violating the terms of any temporary crossing card they may have, because they form an effective obstacle and are located on all major routes north out of the border region.

The deterrence aspect of these traffic checkpoint operations is amply demonstrated by the fact that the illegal alien has to resort to the employment of professional smugglers to provide transportation around or through these checkpoints.

Some of these smuggling operations have developed into sophisticated and involved operations with the following general *modus operandi*:

1. Contact is made between the smuggler and the alien prior to the latter's leaving Mexico.

2. The aliens then make entry on foot, with possibly the aid of a "guide," or by use of temporary border passes. Then they enter vehicles approximately 2 or 20 miles inland after having passed through the Border Patrol's line watch activities.

2. Apparently apprehensions other than those actually made at the checkpoint are included in these figures, but they are a representation of the total activity at these checkpoints and the majority of apprehensions included therein are made at the checkpoints [R.T. 274,396].

3. To get through the traffic checkpoint they might use a "drop house", which acts as a staging area to keep the aliens awaiting inclement weather, or any event that might cause the checkpoint to close down temporarily. Or, they may use a "decoy" vehicle, which is a vehicle loaded with illegal aliens which it is anticipated will be stopped at the checkpoint and would therefore occupy the agents so that other vehicles could pass through without inspection. They even use "scout cars" to probe those roads where temporary checkpoints are maintained, so as to advise other vehicles whether it is safe to proceed.

4. The "load" vehicles themselves can be of any type of conveyance and the methods used to secrete aliens inside them are varied and often show some originality. Unfortunately, sometimes these are very dangerous to the aliens themselves. It has been reported, for example, that it is not at all unusual for an alien to die from asphyxiation while concealed in an automobile trunk or a tank car.

5. The cost of the transportation provided to the aliens is approximately $225 to $250 for each alien for the trip through the checkpoint on to the Los Angeles area. Since smuggling operations are almost exclusively "cash and carry" businesses and the average income among Mexican nationals who may wish to seek residence here illegally is quite small, this cost tends to act as a very significant deterrent in and of itself. The checkpoints are the major reason for such a high price and if they were discontinued for any length of time it would be one more encouragement to illegal immigration.

The deterrent impact of these checkpoints has been noted on several occasions when they resumed operation unexpectedly and a great number of aliens were apprehended.

The evidence presented before this court clearly established that there is no reasonable or effective alternative method of detection and apprehension availa-ble to the Border Patrol in the absence of the checkpoints, for even a geometric increase in its personnel or line watch would not leave any control over those admitted as temporary visitors from Mexico.

Of the approximately half million illegal aliens apprehended in fiscal 1973, virtually none were prosecuted, unless they presented counterfeit or altered documents or aided in smuggling endeavors.

This district has only 3 percent of the total length of land borders, and yet, fully 30 percent of all apprehensions of deportable aliens made in the United States are made within this district.

### ALMEIDA-SANCHEZ

Prior to the *Almeida-Sanchez* decision, it was clear in this Circuit that Border Patrol activities at fixed checkpoints were constitutional. Fernandez v. United States, 321 F.2d 283 (9th Cir. 1963); United States v. Barron, 472 F.2d 1215 (9th Cir. 1973), cert. denied, 413 U.S. 920, 93 S.Ct. 3063, 37 L.Ed.2d 1041 (1973). Since *Almeida-Sanchez*, however, this area of the law has been characterized by extreme instability.

Although Justice White, for the dissent in *Almeida-Sanchez*, stated that it was not disputed that "warrantless searches for aliens without probable cause may be made at fixed checkpoints away from the border," 93 S.Ct. at 2547 and although Justice Powell stated that *Almeida-Sanchez* did not involve the "constitutional propriety of searches at permanent or temporary check points removed from the border or its functional equivalent," 93 S.Ct. at 2541 nevertheless the plurality's language and reasoning appears to require courts to address the question whether searches at the checkpoints are "border searches" for immigration purposes as that term is defined in *Almeida-Sanchez*.

The plurality in *Almeida-Sanchez* rejected two arguments as bases for roving searches with probable cause and without search warrant: the "automobile search" line of cases, Carroll v. United

States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925), et al. and the "administrative search" cases, Camara v. Municipal Court, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967) et al. Only a "border search" rationale could, according to the plurality, justify warrantless searches by immigration officers without probable cause.

That "border search" meant more than searches at the boundary between two countries is evidenced by Justice Stewart's resort to the enigmatic phrase "functional equivalent." Border searches may take place "not only at the border itself, but at its functional equivalents." 93 S.Ct. at 2539.

The judicial inquiry which *Almeida-Sanchez* mandates, therefore, is whether a search is a border search since once it so finds a Court will not be required to determine whether the search is justified on the basis of a legally sufficient warrant or, if not, whether it is nonetheless proper under one of the exceptions to the warrant requirement.

The checkpoints in this District are by design located away from the United States-Mexico boundary line. To withstand constitutional attack they must, under the plurality's view, be located at the functional equivalent of the border. Functional equivalency is a slippery concept but it is this Court's obligation to give some substance to that term.

Justice Stewart, in aid of lower courts, provides examples of what is meant by functional equivalency. An established station near the border, a point marking the confluence of two or more roads that extend from the border, an international airport; these are the functional equivalents of the border. A relatively recent Fifth Circuit case, United States v. Byrd, 483 F.2d 1196 (5th Cir. 1973), suggests yet another example of functional equivalency: where a geographical phenomenon, e. g., a river course, creates an "avenue for the entry of illegal aliens."

These specific examples suggest more generalized criteria. The international airport illustration indicates that the border or its functional equivalent is at the first effective point of entry. The "established station . . . near the border" example indicates a dual concern with intrusiveness and reasonable relation to the end pursued. The "confluence of two roads" illustration reveals the Supreme Court's manifest sensitivity to manpower shortages within the INS, and the Fifth Circuit's example demonstrates a concern with geography and local idiosyncracies.

Our judgment as to whether the checkpoints in the Southern District are at the functional equivalent of the border must be responsive to those concerns manifested by the plurality opinion and by the *Byrd* decisions—the latter echoing Mr. Justice Story's comment that "the court is bound to take notice of public facts and geographical positions; and that this remote part of the country has been infested, at different periods, by smugglers, is a matter of general notoriety. . . ." In The Apollon, 22 U.S. (9 Wheat.) 362, 374, 6 L.Ed. 111 (1824).

## ANALYSIS OF THE OPERATION OF INDIVIDUAL TRAFFIC CHECKPOINTS

This Court next turns to a particularistic survey of each temporary or permanent checkpoint in this District in order to determine whether searches conducted at those checkpoints are border searches for immigration purposes as required by *Almeida-Sanchez.*

### I. CHULA VISTA SECTOR CHECKPOINTS

#### A. SAN DIEGO COUNTY

San Diego County has a 70-mile border with Mexico. Proceeding east from the Pacific Ocean is the South Bay area which presents a serious obstacle to illegal alien traffic because of the military patrols at Ream Field, a U.S. Government installation. The slough of the Old Tijuana River is an additional barrier and effectively stops the illegal aliens from walking up the beach to the

City of Coronado. East along the river bottom is agricultural land which, as one approaches the San Ysidro port of entry, turns into a rapidly developing area with considerable freeway construction and a great congestion of traffic. East of the port of entry is an area with a series of deep finger canyons that cross the international boundary. These deep gullies provide natural conduits or avenues for illegal alien traffic. Continuing in an easterly direction, one finds the Otay Mesa area which is a flat area extending to the foot of Otay Mountain. This rough terrain is a virtual sluiceway for the alien traffic. Between 150 and 200 apprehensions are made each night along this eight-mile section. Next is a very rough mountainous area from Otay Mountain, 3572' in height, over to the Tecate gap. Just before getting to the Tecate port of entry (a City of 12,000 population), one finds the Marron Valley area and 3,885 foot high Tecate Peak with several passes through the mountains easily accessible from Mexico. The very rugged terrain, east of Tecate, discourages all but the most physically vigorous alien. Further east is the Hipass area which is a high plateau with numerous trails and roads over which four-wheel drive vehicles can move. Then at the line between San Diego and Imperial Counties, we find a rough and inhospitable area just before the escarpment drops off into the Imperial Valley.

The actual international border is marked, where possible, by a five strand barbed wire fence, but at no place does the fence constitute an effective barrier.

North of the border is the area where the illegal aliens, having walked across or otherwise entered this country, are picked up in vehicles. This zone of pick-up spots and drop houses includes the South Bay area (Imperial Beach), the City of Chula Vista and the farm roads on Otay Mesa and on Highway 94. The South Bay area and Chula Vista are the densely populated southern suburbs of the City of San Diego, the second largest city in population in California.

San Diego and the area lying just east of San Diego is densely populated. Further east, however, the population becomes very sparse as you enter the rugged mountain areas.

North of San Diego are the northern suburbs of the city, with the populated areas becoming very few once you pass north of the City of Oceanside and Escondido.

North of Oceanside, Camp Pendleton, the U.S. Marine base, occupies almost all the space between the mountains to the east and the ocean to the west.

The location of Camp Pendleton and the mountains of eastern San Diego County act to funnel all northerly traffic along Interstate Routes 5, 15 and State Route 79. Traffic of any kind through the Marine Camp is carefully regulated and the Camp itself is under 24 hour patrol.

### B. SAN CLEMENTE CHECKPOINT (ROUTE I-5)

On Interstate Route 5, north of Oceanside, approximately 62 air miles and 66 road miles from the border is a permanent U.S. Border Patrol checkpoint on a stretch of road which is straight and provides a good view of the checkpoint to oncoming traffic.

This checkpoint is the primary, or cornerstone, checkpoint maintained by the Border Patrol in this District. Over 12,000 deportable aliens were apprehended there alone in fiscal year 1973. The daily logs of this checkpoint from January through August 1973 show that it is an unusual 8 hour shift that does not result in at least 20 or 30 apprehensions. This checkpoint is in operation approximately 65 to 70 percent of the time.

Approximately one mile south of the checkpoint is a large black on yellow sign with flashing yellow lights over the highway stating "ALL VEHICLES, STOP AHEAD, 1 MILE." Three-quarters of a mile further north are two black on yellow signs suspended over the highway with flashing lights stating "WATCH

FOR BRAKE LIGHTS." At the checkpoint, which is also the location of a State of California weighing station, are two large signs with flashing red lights suspended over the highway. These signs each state "STOP HERE—U.S. OFFICERS". Placed on the highway are a number of orange traffic cones funneling traffic into two lanes where a Border Patrol agent in full dress uniform, standing behind a white on red "STOP" sign checks traffic. Blocking traffic in the unused lanes are official U.S. Border Patrol vehicles with flashing red lights. In addition, there is a permanent building which houses the Border Patrol office and temporary detention facilities. There are also floodlights for nighttime operation.

At the point of the checkpoint's location on the west is a very narrow strip of land which then drops off to the Pacific Ocean, while on the east is Camp Pendleton Marine Base. Camp Pendleton is heavily patrolled by the Provost Marshal and does not have any direct roads through it. Consequently, all northbound traffic is funneled through one of the three checkpoints in the Chula Vista sector, with the majority going through San Clemente.

While there is a great deal of commuter traffic south of Oceanside, the traffic at the Interstate 5 checkpoint is predominantly inter-city with few commuter vehicles passing through. Also, at this location the volume of traffic is the lowest of any point on Route 5 between San Diego and Los Angeles. The traffic flow between Los Angeles and San Diego resembles a barbell with Los Angeles and San Diego forming the weighted portions and the I-5 checkpoint being the point least burdensome to traffic along the connecting bar.

San Clemente's operating procedure is unlike any other checkpoint operated in this District. The agent on the point does not converse with the occupants of the vehicles as a general rule, instead, he checks the traffic visually and directs those vehicles he believes need further inspection to the side of the road, where another officer makes further inquiry regarding the status of the occupants. At San Clemente approximately 3 percent of the vehicles are actually stopped and directed off the side of the road for further inquiry and possible inspection.

To insure its effectiveness the Border Patrol attempts to operate this checkpoint around the clock every day of the week, but due to safety factors, such as traffic flow, and weather conditions, the checkpoint has not been operated on that basis in the recent past.

## C. TEMECULA CHECKPOINT (INTERSTATE ROUTE 15)

This is a permanent checkpoint located on Interstate Route 15 (Old 395) approximately 64 air miles and 70 ground miles from the international border. Its location is north of the Temecula River and just south of the junction of Route 15 with State Route 71 which comes in from the east.

The actual checkpoint is located at a point along a straight portion of Route 15 which provides a good view to the oncoming traffic. In operation the usual orange traffic cones channel the two lanes of traffic into one lane with the actual checkpoint being manned by an agent standing in the road. The checkpoint has a light pole which supplies electricity for floodlights for night operations and to supply the flashing red lights mounted on the Border Patrol vehicles which are parked on the side of the road.

During fiscal year 1973, the Temecula station reported that approximately 8,100 deportable aliens were apprehended during traffic checking operations. Reference to the detailed logs of activity for the first eight months of calendar 1973 reflects that virtually every shift which operated during this period apprehended deportable aliens. The apprehension of forty aliens during any one day of operation was not considered unusual.

While there is a great deal of commuter traffic south of Escondido, with

bumper to bumper traffic on Route 15 at many places, the traffic volume at the Temecula checkpoint location is one of the lowest at any place along Route 15 from San Diego to Riverside, California.

The operating procedures at this checkpoint are much like all others, except San Clemente, in that the officer on point introduces himself with "Good morning, this is an immigration checkpoint. What is your citizenship, please?" After this and the response from the occupants the vehicle either is allowed to proceed or is detained for a short period to inspect the vehicle. The inspector generally takes no longer than two to three minutes. At Temecula the percentage of vehicles stopped for conversation ranges from 15 to 50 percent depending upon the volume of traffic, while the percentage of vehicles actually inspected would amount to about 5 percent of all vehicles.

### D. OAK GROVE CHECKPOINT (STATE ROUTE 79)

This checkpoint is maintained on a straight portion of Highway 79 approximately 10 miles south of the Riverside County line and 56 air miles and 91 road miles from the Mexican border. It is maintained intermittently, being in operation no more than 20 percent of the time.

With the exception of a trailer, used as an office at this location, this checkpoint has the usual equipment and the operating procedures in regard to traffic handling are conducted as at Temecula. The percentage of vehicles which are stopped is close to 100 percent, with many of the stops being solely for an exchange of courtesies. This is made possible by the low volume of traffic on this highway. Highway 79 from Interstate 8 in San Diego to Riverside County has a very limited traffic flow and the number of vehicles passing through this checkpoint is one of the lowest of any place along this highway.

### II. EL CENTRO SECTOR

### A. IMPERIAL COUNTY

Imperial County lies to the east of San Diego County and extends to the California-Arizona border. The terrain along the border from San Diego, moving east is very rough, with rocks and canyons which are almost inaccessible. This is followed by a drop down to the desert, at sea level, which continues to approximately 10 miles west of Calexico where agricultural land begins with the All American Canal running adjacent to the boundary line. The farm land continues east for about 10 miles and then the remaining area, extending to the California-Arizona border, is all sandy desert. The entire Mexican border adjacent to Imperial County is approximately 75 miles long with the only population of note being in Calexico, a City of about 18,000, on the California side, and Mexicali, the capital of Baja, California, with a population of approximately 400,000, being directly across the border from Calexico. The only fence along the boundary line is a limited five mile long length around the port of entry at Calexico.

The County has several areas which have been declared off-limits to the public in that they comprise U.S. Government reservations. The most significant of these is the aerial gunnery range in the Chocolate Mountains. The gunnery range encompasses a large part of the land area of Imperial County stretching from the Orocopia Mountains in the North along the Coachella Canal (which runs northeast of the Salton Sea) and as far southeast as Highway 78. Other natural geographic features are the Salton Sea in the northwest portion of the county which is 45 miles long and 15 miles wide, and the two large desert regions in the county. East of the East Highland Canal are sand hills which cover an entirely desolate desert area with virtually no inhabitants whatsoever. In the western part of the County is also uninhabited desert from the Salton Sea

south to the Mexican border. The population of Imperial County is situated in the center of the County where there is a large concentration of excellent farm land. Through this entire region there runs a number of parallel roads northward which funnel eastbound traffic onto Routes 78 and Interstate 8 to Arizona and onto Routes 86 and 111 to the northwest towards Riverside and Los Angeles. Because of the natural configuration of the land and the establishment of the gunnery range, there are only a few roads which can be taken by the average vehicle to areas lying north or east of the County.

## B.  STATE ROUTE 86

The Border Patrol has established a checkpoint on Route 86 west of the Salton Sea National Wildlife Refuge just north of the intersection of State Route 78. This location is approximately 36 air miles and 49 road miles from the Mexican border. The checkpoint is bordered on the east by farm land extending for about three miles to the Salton Sea. To the west and south of this checkpoint lies desert.

At this location the Border Patrol has a building and traffic check signs together with blinker lights. A power source is located at the facility. The signs are of the usual type and the floodlights at night cause the area to be very well lit. As can be seen from photographs introduced by the government, the area is desolate country with virtually no inhabitants between the checkpoint and the border.

The Border Patrol attempts to keep this checkpoint operating on a 24-hour basis and in fiscal 1973 they operated around 6,000 hours which is approximately 65 to 70 percent of the time.

At this checkpoint the checking operations are of the usual type with about 75 percent of the vehicles traveling through it being stopped for inquiry with around 10 percent to 15 percent of

all vehicles being detained for further inspection. It is estimated that over half of the vehicles at this checkpoint have come directly from Mexicali or have occupants who walked across the border at Calexico.

During the first ten months of calendar year 1973 approximately 690 deportable aliens were apprehended at this checkpoint according to the detailed traffic logs maintained by the Border Patrol.

This checkpoint is located on a point with one of the lowest volumes of traffic along Route 86 north of the population centers of Calexico, Brawley and El Centro.

## C.  ROUTE 111

On State Route 111 seven miles north of Niland, California, between the Salton Sea and the Chocolate Mountain Aerial Gunnery Range, and approximately 44 air miles and 51 road miles from the Mexican border, is another fixed checkpoint.

This checkpoint and that on Route 86 constitute the major traffic checkpoint operations in Imperial County and are geared to check all northbound traffic leaving the border region in a northwesterly direction.

Traffic logs reveal that for the first ten months of calendar year 1973 approximately 730 deportable aliens were apprehended at this location, which has the lowest volume of traffic of any point on Route 111.

The operating procedures at this checkpoint are much like its Salton Sea companion on Route 86, with approximately 75 percent of all vehicles being stopped for a limited verbal inquiry and approximately 10 percent of all vehicles being given some type of cursory inspection before resuming their journey northward.

The physical arrangement of the checkpoint is in accord with official policy in that the checkpoint has all the usual

equipment including nighttime lighting facilities.

### D.   HIGHWAY 78 at OGILBY ROAD

The Border Patrol also maintains a checkpoint on Highway 78 just north of of the juncture of Ogilby Road and approximately 12 miles northeast of Glamis, California. This checkpoint is about 31 air miles and 37 ground miles from the Mexican border. Ogilby Road has recently been paved and it extends directly from Interstate Route 8 which at the point of that intersection is about three miles from the international boundary line.

This checkpoint has the usual accessories, including a portable light plant, and is operated like the checkpoints at Routes 86 and 111, with approximately 75 percent of all vehicles being subject to some limited inquiry.

During fiscal year 1973 the checkpoint was operated for about 2,000 hours while during the first ten months of calendar year 1973 over 660 deportable aliens were apprehended at this checkpoint.

The location of the checkpoint is east of the Navy Gunnery Range and, in conjunction with the Route 111 checkpoint, serves to straddle that government reservation. This location on Highway 78 has an estimated northbound traffic volume of around 450 vehicles daily and has almost the least traffic on Route 78 from its junction with Route 111 in Brawley to its end at Interstate Route 10 near Blythe, California. The terrain in the immediate area and south of this checkpoint is that of virtually uninhabitable desert.

### E.   ROUTE S-22

The Border Patrol operates a checkpoint on Route S-22 west of Salton City located approximately 45 air miles and 71 ground miles from the Mexican border. Route S-22 is the only route east

of Route 79 coming from San Diego County which provides egress from that county, and it runs just north of the fossil beds in the West Imperial County desert.

The operation of the checkpoint is basically the same as that of the checkpoint on Route 78 with warning signs, blinking red lights on the vehicles and with an electric power source for nighttime use.

This checkpoint is maintained, because Route S-22 otherwise could be used as a bypass around the Imperial County sector.

Operations at this fixed checkpoint are on about a 50 percent level and during the first ten months of calendar year 1973 almost 340 deportable aliens were apprehended at this checkpoint.

### F.   OTHER FIXED CHECKPOINTS

In addition to the four main checkpoints discussed above, the Border Patrol also operates other checkpoints in Imperial County on occasion.

1.   The Border Patrol operates a checkpoint occasionally on a dirt road which parallels the Coachella Canal at a point north of the checkpoint on Route 111. This roadway could be used to circumvent or bypass the Route 111 highway and checkpoint and its operation is to avoid such usage. It is an extremely desolate area near the Navy Gunnery Range. Very few vehicles use the road, typically an average of around three or four vehicles during an eight hour period. The checkpoint is operated like the others in this sector, but with far less equipment.

2.   On Route S-2 at the junction of Highway S-2 and Shell Canyon Road at Ocotillo, California, the Border Patrol occasionally maintains a fixed checkpoint. The terrain here is desolate desert with no homes in the area which is approximately 8 miles due north of the international boundary line with Mexico.

Given the very light traffic on S-2 the checkpoint has a minimum of equipment on hand. During fiscal year 1973 this checkpoint was open only 200 or 250 hours and during the first ten months approximately 40 deportable aliens were apprehended at this checkpoint.

3. South of the S-2 checkpoint the Border Patrol occasionally maintains a checkpoint on Interstate 8 (I-8) approximately six miles west of Ocotillo, California. The operations here are only when the Border Patrol has specific information of a smuggling effort coming out of the desert area. The equipment is of a portable nature. During the first ten months of calendar 1973 the checkpoint was in operation over 135 hours and almost 70 deportable aliens were apprehended.

4. In addition, the Border Patrol operates two checkpoints during the harvesting seasons for the purpose of checking the labor buses early in the morning to apprehend any illegal aliens who have evaded the line watch patrols. For convenience, these two checkpoints have been designated "A", located at the intersection of Cole Road and Highway 111 about one mile from the border, and "B," located on Highway 98 at the intersection of Interstate 8 about two miles from the border. The checkpoints are set up for only a few days during the year for a very short period, and yet the results normally produce apprehensions of 20 or 30 deportable aliens within a few hours each day. Traffic logs maintained for these agricultural bus checks on Highway 111 show 19½ hours of operation during October 1973, producing 100 apprehensions. In June 1973, the same checkpoint operated for only 16 hours and yet 103 deportable aliens were located.

---

3. The Government argues that San Clemente as well as the other checkpoints in this District meet Justice Powell's requirements for the equivalent of probable cause. Furthermore, citing United States v. Schafer, 461 F.2d 856 (9th Cir. 1972), the Government contends that having established the equivalent of probable cause no warrant is required

## CONCLUSION

Having analyzed with particularity the characteristics and operating procedures of each of the checkpoints within this District, we turn now to measure each checkpoint against the "border search" definition of *Almeida-Sanchez.*

■ Previously we have noted that under *Almeida-Sanchez,* border searches are those which take place at the first effective point of entry subject to the tests of instrusiveness and reasonable relation to the end pursued and to due consideration for geographic characteristics and available manpower resources.

■ The San Clemente checkpoint is constitutional under these criteria. It is located at the point at which traffic volume is the lowest along the main artery connecting Los Angeles with San Diego. California Dept. of Public Works, Div. of Highways, 1972 Traffic Volumes on the California Highway System, 19 (1972). The checkpoint entails for the average motorist nothing more than a fleeting stop; even for those vehicles selected for actual inspection the delay is slight. Bounded on the east by Camp Pendleton and on the west by the Pacific Ocean, the checkpoint straddles a natural corridor along which illegal aliens frequently travel in their migration towards the labor markets in the north. Even though the checkpoint is in operation for less than 24 hours per day, it is a permanent checkpoint in that it never varies with respect to location and closes only in response to heavy traffic or adverse weather conditions—circumstances both of which affect the safety of the stop and its intrusiveness.[3]

The San Clemente checkpoint is the cornerstone of the checkpoint system.

---

because of the "inherent distinction" between roving searches (where Justice Powell would require an area search warrant) and checkpoint searches. In view of our holding that the checkpoints are the functional equivalents of the border, for immigration purposes, however, we need not consider this argument.

Once the checkpoint along Interstate 5 is designated, the various other checkpoints fall into place since each checkpoint relates to all others in such a manner as to preclude evasion by the use of bypass roads. Clearly there is no one spot which is constitutionally mandated to fix a checkpoint. Rather there is a constitutionally permissible zone within which the jealously guarded Fourth Amendment rights and legitimate needs of law enforcement can coexist. San Clemente is within that zone.

■ Likewise, the Temecula checkpoint is within the constitutionally permissible zone. Although not situated at the least intrusive point along Interstate 15, the Temecula checkpoint's location is largely dependent on the positioning of the Interstate 5 checkpoint and on the existence of bypass routes, such as State Highway 71 and County Route 16, which otherwise would compromise the integrity of the checkpoint system. No two checkpoints screening traffic along the westernmost and middle routes of the Chula Vista sector which illegal aliens frequently follow to the north could be chosen which together interfere less with highway traffic yet avoid circumvention by sophisticated alien smugglers.

The Temecula checkpoint is also a permanent checkpoint. It is constant with respect to location; while it operates less than 24 hours per day it does operate for substantial periods of time. The checkpoint is located along the second major conduit in the Chula Vista sector to the Los Angeles area as evidenced by the large numbers of illegal aliens apprehended at Temecula.

■ The third checkpoint within the Chula Vista sector is the Oak Grove checkpoint. Oak Grove is a temporary checkpoint even though it is consistently located at or about the same spot along State Route 79. Oak Grove is operated, however, only about 20 percent of the time. Although Justice Stewart's opinion classifies checkpoints in terms of temporary and permanent, we see no constitutional issue turning on that dis-

tinction. We note, however, that we do not have before us a case where the checkpoint varies substantially both in terms of location and time of operation. Oak Grove while temporary in time is fixed in location and, therefore is not constitutionally distinguishable from the other fixed checkpoints of San Clemente or Temecula.

In view of the trickle of traffic moving on Highway 79 from Interstate 8 to Riverside, Oak Grove does not interfere with any significant movement of the public. Nevertheless, the geographic contours of the area are such that this area is the third gate to the north within the Chula Vista sector. The exact location of Oak Grove is nearly predetermined by the location of the other two checkpoints within this sector. If the Oak Grove checkpoint were moved closer to the border, smugglers could easily bypass the station by driving along the routes leading to the San Clemente or Temecula checkpoint and merely turning east as soon as they reached a point north of Oak Grove.

■ The checkpoints in the Chula Vista sector reenforce each other and each prevents the circumvention of any other checkpoint; they are a system and one cannot be tampered without affecting the positioning of the others. Once Interstate 5 is positioned, the options for establishing other checkpoints are severely reduced. In addition, one must keep in mind that checkpoints are also established to police the limitations of I-186 cards, i. e. restriction on alien passage to within 25 miles north of the border and for 72 hours. In view of all the circumstances, we hold that the Chula Vista sector checkpoints are the functional equivalent of the border for immigration purposes.

The fixed checkpoints in the El Centro sector not only tend to ensnare those unwary illegal aliens who have crossed the international boundary into Imperial County at a point other than a formal border crossing, but also serve to confront, detect and apprehend illegal en-

trants who have crossed the boundary into San Diego County and attempt to evade confronting the checkpoints there by swinging east into Imperial County, from there intending to move northward. In this regard it must once more be observed that the checkpoints in the Southern District ought to be conceptualized as parts of a systemic, integrated whole in which each part is, to some extent, interdependent upon the functioning of the other parts.

▆ The checkpoint on Route 86 is situated at a point with one of the lowest volumes of traffic on that highway, thus tending to cause little intrusion and inconvenience to travelers, as well as scarcely impeding the goal of safe driving. This checkpoint is not easy to intentionally circumvent without being steered into another checkpoint on another highway, in that it is bordered by the Salton Sea on one side and desert on the other. It lies just 36 air miles from the Mexican border and it has been estimated that over half of the vehicles reaching this checkpoint have come directly from Mexicali, B.C., Mexico. Accordingly, the Court finds that this checkpoint constitutes a functional equivalent of the border for immigration purposes.

▆ The checkpoint on Route 111 also is located such that it is not easily bypassed, lying between the Salton Sea and the Chocolate Mountain Aerial Gunnery Range. Traffic logs indicate that this particular location has the lowest volume of traffic of any point on this highway, thus making this checkpoint as minimally intrusive and inconvenient to the innocent as a checkpoint could be on this highway. This checkpoint, lying 44 air miles from the border, complements the checkpoint on Route 86, thus together constituting the major traffic checkpoint operations in the El Centro sector. The Court finds this checkpoint to be the functional equivalent of the border for immigration purposes.

▆ The checkpoint on Route 78 is situated just north of its junction with Ogilby Road, a paved road which commences about three miles from the border and then extends northward for some 24 miles through no towns and utterly barren desert. This checkpoint, lying about 31 air miles from the border is located, then, immediately after the confluence of two highways leading north from the border. In that this checkpoint is adjacent to the Aerial Gunnery Range and surrounded on all other sides by virtually uninhabitable desert, it is not easily circumvented by one seeking to avoid detection by moving in a northeasterly direction from the border. It is located at almost the least-traveled spot on Route 78 between Brawley and Blythe, California, where Route 78 ends. Thus, there is little intrusion and inconvenience to innocent travelers on this highway caused by the checkpoint. The Court finds it to be the functional equivalent of the border.

▆ Route S-22, west of Salton City, California, is the site of a checkpoint located about 45 air miles from the border. This highway, running east and west, provides egress from San Diego County for those illegal entrants who might be endeavoring to bypass checkpoints in that county, as well as the more southerly checkpoints in Imperial County. So situated, it complements the network of checkpoints to the west in San Diego County, rendering them more effective. The Court finds this checkpoint to be the functional equivalent of the border.

Though the above-listed and discussed checkpoints constitute the primary part of the checkpoint scheme in the El Centro sector, there are a number of infrequently-operated, temporary checkpoints occasionally utilized in the County. These checkpoints have been cited and discussed on pages 414–415, above, under the subheading "OTHER FIXED CHECKPOINTS."

▆ The checkpoint on the dirt road parallelling the Coachella Canal constitutes a manifestly insignificant intrusion on the traveling public, with only three or four vehicles per eight hours

passing by on the average. This checkpoint is designed to thwart those entrants who would evade the Route 111 checkpoint. Thus it complements the efficacy of that checkpoint. The two checkpoints together would be difficult to bypass, the Salton Sea being on one side of them and the Aerial Gunnery Range on the other. The Court finds this temporary checkpoint to be the functional equivalent of the border for immigration purposes.

■ The temporary checkpoint on Route S-2 and Shell Canyon Road at Ocotillo, California, lies only eight miles north of the border. The terrain consists of desert and there are no homes in the area. Nor are there any other towns in the vicinity. Due to its extreme proximity to the border and distance from the nearest border crossing, the Court finds this checkpoint to be the functional equivalent of the border for immigration purposes.

■ The checkpoint established occasionally on Interstate 8, six miles west of Ocotillo, is only about five miles from the border with no homes or towns in between. As a matter of practical fact, this checkpoint is operated only when the Border Patrol acquires information indicating a smuggling effort is proceeding in that direction and thus, perhaps probable cause to stop and question may well often be established by such information. In any event, due to its proximity to the border, the lack of anything except desert in between the checkpoint and the border, and the distance of about 35 air miles from the nearest formal border crossing, the Court is convinced that this temporary checkpoint is also the functional equivalent of the border for immigration purposes.

■ The checkpoints operating briefly each year during the harvesting seasons, lying respectively only one and two miles from the border, checking the early morning labor buses, result typically in 20 to 30 apprehensions of illegal entrants within a few hours each morning of operation. Due, again, to the proximity to the border of these checkpoints

and the very limited intrusiveness and inconvenience (as with all of these temporary checkpoints), as well as the specificity of information being acted upon, the Court finds these two checkpoints to be the functional equivalent of the border.