514 F.2d 308
 UNITED STATES of America, Plaintiff-Appellee,
v.
Amado MARTINEZ-FUERTE, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellant,
v.
Jose JIMINEZ-GARCIA, Defendant-Appellee.
UNITED STATES of America, Plaintiff-Appellant,
v.
Raymond Rangel GUILLEN and Fernando Medrano-Barragan,
Defendants-Appellees.
 Nos. 74-2462, 74-2680 and 74-2714.
 United States Court of Appeals,
Ninth Circuit.
 March 5, 1975.
 
 Charles M. Sevilla, Frank M. Mangan, Federal Public Defenders, San Diego, Cal. (argued), for defendants-appellants.
 Jack Robinson, Asst. U. S. Atty. (argued), for plaintiff-appellee.
 Before DUNIWAY and CARTER, Circuit Judges and WEIGEL,* District Judge.
 OPINION
 DUNIWAY, Circuit Judge:
 
 
 1
 These consolidated appeals question the constitutionality of stops and immigration inspections, without probable cause or founded suspicion, of vehicles passing through the San Clemente traffic checkpoint, as operated by the United States Border Patrol under an inspection warrant issued by a United States magistrate. We hold that the warrant is invalid and that the checkpoint operations which it purports to authorize violate the Fourth Amendment of the Constitution.
 
 
 2
 I. The Facts.
 
 
 3
 A. The Three Appeals.
 
 
 4
 1. No. 74-2462, Martinez-Fuerte.
 
 
 5
 Martinez-Fuerte appeals from a conviction of transporting "illegal" aliens in violation of 8 U.S.C. § 1324(a)(2). On June 24, 1974, in Tijuana, Mexico, two Mexican women met an unidentified man who promised to take them into the United States in return for their promises to pay him $200 each once they started working. Using false papers provided by the man, the two women entered the United States at the port of entry at San Ysidro, California. From there, according to the man's instructions, the women traveled by bus to San Diego, where they again met the man and returned the false papers to him. He directed them to Martinez-Fuerte's car. Without asking his passengers where they were going, Martinez-Fuerte drove north towards Los Angeles along Interstate 5.
 
 
 6
 At approximately 8:00 p. m. on June 24, they reached the San Clemente checkpoint. There they were stopped by border patrol agents acting under a "warrant of inspection" issued by a United States magistrate on June 22, 1974. Martinez-Fuerte was instructed to drive off the highway to a secondary inspection area where an agent questioned him and his two passengers about their rights to be in the United States. Martinez-Fuerte, an immigrant, was lawfully within the country and so demonstrated with appropriate identification. However, in response to the agent's inquiry, the two female passengers admitted being citizens of Mexico, illegally within the United States. Martinez-Fuerte was then arrested and charged with transporting "illegal" aliens, i. e., those unlawfully in this country.
 
 
 7
 Before trial he moved to suppress all evidence derived from the stop and detention at the checkpoint on the grounds that the stop was made without founded suspicion, probable cause, or valid warrant. On appeal, he challenges his conviction by arguing that this pre-trial motion, which was denied, should have been granted.
 
 
 8
 2. No. 74-2680, Jiminez-Garcia.
 
 
 9
 Also on June 24, 1974, Jiminez-Garcia, driving a 1968 Chevrolet, was stopped and detained at the San Clemente checkpoint. There agents discovered that his passenger was an "illegal" Mexican alien. The passenger had made arrangements with an unknown person in Tijuana to be smuggled into the United States and transported to Los Angeles. Earlier on the day of the stop, the alien had been guided across the border to a certain residence in San Ysidro, where he stayed for a short time before meeting Jiminez-Garcia for the trip north. Jiminez-Garcia was charged with transporting an "illegal" alien in violation of 8 U.S.C. § 1324(a)(2) and conspiracy to transport an "illegal" alien in violation of 18 U.S.C. § 371. The trial court granted his motion to suppress, and the government appeals.
 
 
 10
 3. No. 74-2714, Guillen.
 
 
 11
 On June 28, 1974, a border patrol agent at the San Clemente checkpoint stopped the car which Guillen was driving in the company of Medrano-Barragan and the latter's wife. Upon inquiry the agent learned that the two passengers were "illegal" aliens. Guillen was a United States citizen. Agents then searched the car and discovered three more "illegal" aliens in the trunk.[1] Medrano-Barragan had led the other aliens across the border at the beach near Tijuana, Mexico, and to a highway in the United States where they piled into Guillen's car for the drive north. Guillen and Medrano-Barragan were charged with inducing illegal entry of aliens in violation of 8 U.S.C. § 1324(a)(4), transporting "illegal" aliens in violation of 8 U.S.C. § 1324(a)(2), and conspiracy, in violation of 18 U.S.C. § 371. The trial court granted defendants' motion to suppress, and the government appeals.
 
 
 12
 B. The Warrant of Inspection.
 
 
 13
 The focal point of these appeals is the "warrant of inspection" which the government sought and obtained from a United States magistrate on June 22, 1974, to "authorize" the continued operation of the San Clemente immigration traffic checkpoint shortly after recent decisions of this court had sharply curtailed border patrol authority to search or stop passing vehicles at that checkpoint. The warrant, which is set out in full in the margin,[2] concludes that there is "probable cause" to believe that mass violations of the immigration laws are committed at the San Clemente checkpoint and therefore commands the border patrol to conduct an immigration traffic checkpoint, stopping northbound vehicles to make routine inquiries to determine the immigration status of the occupants. At issue here is the constitutionality of this stop and inquiry procedure.[3]
 
 
 14
 We make two further observations about the warrant. First, although the warrant is limited in duration to ten days, it has been renewed 26 times for ten-day periods. (San Francisco Examiner, February 25, 1975, page 6.) The particular warrant before us, then, was by no means a temporary measure; it was simply the first installment in what appears to be a perpetual succession of similar warrants. Second, although the warrant incants the words probable cause, there is no claim that there existed probable cause in the traditional sense of articulable, individuating circumstances which would lead a reasonable agent to believe that "illegal" aliens were in any particular vehicles. In each case the government has stipulated that there was neither probable cause nor founded suspicion for the stop. The government relies solely on the inspection warrant to justify the stops and inquiries.
 
 
 15
 C. Operation of the Checkpoint.
 
 
 16
 We have in the record before us only summary accounts of the three stops involved in the instant appeals. But to decide the validity of the inspection warrant and the checkpoint operations it authorizes, we must also consider the routine procedures to which innocent ordinary travelers are subjected. To that end, counsel have supplemented the record in these cases with the official reporter's transcript of hearings held in the Southern District of California to assess the impact of Almeida-Sanchez v. United States, 1973, 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596, on the checkpoint operations. United States v. Baca, S.D.Cal., 1973, 368 F.Supp. 398, summarizes the findings made after those hearings. In issuing the inspection warrant which is now before us, the magistrate expressly relied on the Baca court's findings and on the reporter's transcript in that case. We have reviewed that transcript[4] as well as the records in the instant appeals to help us understand what goes on at the San Clemente checkpoint.
 
 
 17
 Although the San Clemente checkpoint has been the subject of previous cases before this court,[5] we think it important to summarize here just how the checkpoint works. As the enforcement arm of the Immigration and Naturalization Service, the border patrol operates what it calls a permanent fixed immigration checkpoint on Interstate 5 near San Clemente. Actually the checkpoint is five miles south of San Clemente at San Onofre, between San Onofre State Beach on the west and Camp Pendleton Marine Base on the east. The checkpoint is 62 miles by air and 66 miles by road from the international border with Mexico. Baca, supra, 368 F.Supp. at 410. Interstate 5 is an eight lane freeway, the principal highway connecting California's two largest cities, Los Angeles and San Diego. The route is heavily traveled. According to the affidavit of Robert D. McCord submitted in support of the application for the inspection warrant, on the average 1200, and at peak times over 2500, cars pass through the checkpoint per hour. Clerk's Record in No. 74-2462 at 91, 93. Simple multiplication of the hourly average reveals that over ten and one-half million cars pass the checkpoint in a year. The overwhelming majority of persons traveling north through the checkpoint are lawfully within the country; indeed, most of them are not aliens and have not crossed the border at all.
 
 
 18
 When in operation, the checkpoint operates as a roadblock causing all northbound vehicles, which are generally traveling at freeway speeds, to slow or come to at least a "fleeting stop" for an immigration check. Baca, supra, 368 F.Supp. at 411, 415. The Baca court described the physical layout of the checkpoint as follows:
 
 
 19
 Approximately one mile south of the checkpoint is a large black on yellow sign with flashing yellow lights over the highway stating "ALL VEHICLES, STOP AHEAD, 1 MILE." Three-quarters of a mile further north are two black on yellow signs suspended over the highway with flashing lights stating "WATCH FOR BRAKE LIGHTS." At the checkpoint, which is also the location of a State of California weighing station, are two large signs with flashing red lights suspended over the highway. These signs each state "STOP HERE U.S. OFFICERS". Placed on the highway are a number of orange traffic cones funneling traffic into two lanes where a Border Patrol agent in full dress uniform, standing behind a white on red "STOP" sign checks traffic. Blocking traffic in the unused lanes are official U.S. Border Patrol vehicles with flashing red lights. In addition, there is a permanent building which houses the Border Patrol office and temporary detention facilities. There are also floodlights for nighttime operation. 368 F.Supp. at 410-11.
 
 
 20
 The officer at the "point" (between lanes of traffic) surveys the oncoming cars, looking for those which in border patrol parlance "break the pattern" of the traffic. Baca, supra, 368 F.Supp. at 406. Sometimes border patrol agents stationed further south along the highway have by radio alerted the agent at the "point" to give special scrutiny to a particular approaching vehicle. Baca R.T. 202. In any event, the agent at the "point" makes a purely discretionary decision whether to wave each auto through the checkpoint after it has slowed or come to a "fleeting stop." Id. If for some reason a vehicle arouses the officer's suspicion, he will divert it to a secondary inspection area where the travelers will be detained for inquiry by other agents into their citizenship and immigration status. Id.; Baca, supra, 368 F.Supp. at 406-07.
 
 
 21
 Ideally the border patrol would like to operate the checkpoint every day around the clock. Baca R.T. 177, 293. Historically, however, the border patrol has operated the San Clemente checkpoint for only 65 to 70 percent of the time. Baca, supra, 368 F.Supp. at 410. Inclement weather and peak traffic make the checking operations hazardous, and the border patrol often voluntarily closes the checkpoint.[6] At other times manpower shortages may force the border patrol to suspend checking. The checkpoint requires at least five officers when traffic is light and seven to eight when traffic is heavier. Baca R.T. 431. During the roughly eight-day period of checkpoint operations summarized by the return on the instant warrant of inspection, the border patrol operated the San Clemente checkpoint for only about 124 hours out of 199 total hours, or slightly under two-thirds of the time. (Clerk's Record in No. 74-2462 at 75.)
 
 
 22
 As required by the magistrate's order, the return on the warrant of inspection provides a statistical summary of checkpoint activity. From 4:00 p. m. on June 22, 1974, through approximately 11:00 p. m. on June 30, an estimated 145,960 vehicles passed through the San Clemente traffic checkpoint during the 124 hours and ten minutes of checking operations. We may assume that all of these cars were forced to interrupt their normal progress and slow to or nearly to at least a momentary halt for scanning by the officer at the "point." Of these, 820 vehicles were referred to "secondary" for questioning regarding nationality and citizenship. Of those diverted to secondary, 202 vehicles were "inspected," whatever that means. Border patrol agents found deportable aliens in "plain view" in 169 of the 202 vehicles. In 33 cases, all allegedly with the consent of the drivers, agents searched portions of the vehicles in which "illegal" aliens could be secreted. In only two of these 33 searches, agents found deportable aliens. In all, 725 deportable aliens were found in 171 vehicles as a result of checkpoint operations during the eight-day period. Affidavit of Gene E. Harris, the border patrol agent in charge of the San Clemente checkpoint, Clerk's Record in No. 74-2462 at 75-76, 79.
 
 
 23
 These border patrol statistics reveal that of the 145,960 vehicles passing through the checkpoint, only 171, or 0.12 percent, were found to contain deportable aliens. To be sure, it is possible that other "illegal" aliens, well camouflaged to avoid "breaking the pattern" of traffic, seeped through the checkpoint strainer, but there is no record of this. We doubt that there were many because the border patrol was "overzealous" by a factor of nearly five in diverting cars for secondary inspection. Of 820 cars diverted, 649 had no "illegal" aliens in them.
 
 
 24
 II. The traffic immigration checkpoint operated under the inspection warrant is unreasonable under established constitutional standards.
 
 
 25
 A. Almeida-Sanchez and the cases that follow it forbid warrantless checkpoint operations.
 
 
 26
 The cases now before us bring us to the logical, and predictable, next step in the development of search and seizure doctrine under Almeida-Sanchez v. United States, 1973, 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596, and its progeny in this circuit. In Almeida the Supreme Court held unreasonable a roving patrol immigration stop and search of an automobile where border patrol agents had neither probable cause nor a warrant. The Court did not decide the validity of temporary or permanent fixed checkpoint immigration searches. That question came before us in United States v. Bowen, 9 Cir., in banc, 1974, 500 F.2d 960, cert. granted, 1974, 419 U.S. 824, 95 S.Ct. 40, 42 L.Ed.2d 47, where we held that, in light of the principles enunciated in Almeida, fixed checkpoint searches conducted without probable cause also violate the Fourth Amendment.
 
 
 27
 Both Almeida and Bowen dealt with full searches, while the cases now before us involve a somewhat less intrusive stop and inquiry procedure. However, a stop of an automobile invokes Fourth Amendment protection. United States v. Larios-Montes, 9 Cir., 1974, 500 F.2d 941, 943. See Terry v. Ohio, 1968, 392 U.S. 1, 16, 88 S.Ct. 1868, 20 L.Ed.2d 889. Although we have frequently upheld automobile stops made on less than probable cause, we have also held that the Fourth Amendment requires that such stops be justified by articulable facts and circumstances which support the conclusion that the intrusion was not unreasonable. United States v. Mallides, 9 Cir., 1973,473 F.2d 859, 861. The minimal requirement to authorize a stop of a car is a founded suspicion. United States v. Larios-Montes, supra; United States v. Jaime-Barrios, 9 Cir., 1974, 494 F.2d 455, cert. denied, 417 U.S. 972, 94 S.Ct. 3178, 41 L.Ed.2d 1143; United States v. Ward, 9 Cir., in banc, 1973,488 F.2d 162; United States v. Bugarin-Casas, 9 Cir., 1973, 484 F.2d 853, cert. denied, 1974, 414 U.S. 1136, 94 S.Ct. 881, 38 L.Ed.2d 762; Wilson v. Porter, 9 Cir., 1966, 361 F.2d 412.
 
 
 28
 In United States v. Juarez-Rodriguez, 9 Cir., 1974, 498 F.2d 7, we held that even "routine" stops at the San Clemente checkpoint require a founded suspicion.[7] In United States v. Brignoni-Ponce, 9 Cir., in banc, 1974, 499 F.2d 1109, cert. granted, 1974, 419 U.S. 824, 95 S.Ct. 40, 42 L.Ed.2d 48, we held that a roving patrol-type stop conducted by border patrol agents at the San Clemente checkpoint, while the checkpoint itself was not in operation, violated Fourth Amendment standards because it was not based on a founded suspicion.
 
 
 29
 Of course, neither Almeida nor our decisions interdict warrantless and causeless searches and seizures at the border or its functional equivalent. Although the district court in Baca, supra, concluded that the San Clemente and all other fixed checkpoints in California were functional equivalents of the border, we have since overruled that conclusion. United States v. Esquer-Rivera, 9 Cir., 1974, 500 F.2d 313 (Ocotillo checkpoint); United States v. Morgan, 9 Cir., in banc, 1974, 501 F.2d 1351 (San Clemente checkpoint); United States v. Bowen, supra (State Highway 86 checkpoint).
 
 
 30
 Almeida and the cases it has sired in this circuit thus establish a clear doctrinal background for the three cases now before us. The requirements of the Fourth Amendment apply with full vigor at immigration checkpoints. A stop, even a "fleeting stop," is subject to Fourth Amendment protections. At least absent a warrant, the border patrol must have a founded suspicion to stop a vehicle at a checkpoint and probable cause to search it. As the government concedes, under our decisions and absent a valid warrant the border patrol cannot continue its checkpoint operations.
 
 
 31
 B. The inspection warrant does not legitimize the checkpoint operations.
 
 
 32
 The issue here is whether the warrant of inspection somehow transforms otherwise unreasonable seizures into constitutional ones.[8] We now hold that it does not. We adhere to the principles announced by the Supreme Court in Carroll v. United States, 1925, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543, which involved the search for and seizure of contraband liquor by prohibition agents and which we paraphrase as follows:
 
 
 33
 It would be intolerable and unreasonable if a (border patrol) agent were authorized to stop every automobile on the chance of finding ("illegal" aliens) and thus subject all persons lawfully using the highways to the inconvenience and indignity of such a search. Travellers may be so stopped in crossing an international boundary because of national self-protection reasonably requiring one entering the country to identify himself as entitled to come in, and his belongings as effects which may be lawfully brought in. But those lawfully within the country, entitled to use the public highways, have a right to free passage without interruption or search unless there is known to a competent official, authorized to search, probable cause for believing that their vehicles are carrying contraband (,) illegal merchandise (, or "illegal" aliens).
 
 
 34
 Id. at 153-54, 45 S.Ct. at 285. Accord, Almeida, supra, 413 U.S. at 274-75, 93 S.Ct. 2535; Bowen, supra, 500 F.2d at 963; Brignoni, supra, 499 F.2d at 1111.
 
 
 35
 Federal agents cannot constitutionally stop automobiles systematically or randomly on the chance of discovering something illegal. United States v. Mallides, 9 Cir., 1973, 473 F.2d 859, 860. Although the inspection warrant and its supporting affidavits contain conclusory allegations of probable cause to believe that the immigration laws are being violated at the San Clemente checkpoint, that is not sufficient. These are not "specific and articulable facts" which would justify the stopping of the defendants' cars in these cases. In practical effect the warrant purports to authorize precisely the unconstitutional conduct we condemned in Bowen, Juarez-Rodriguez, and Brignoni-Ponce.
 
 
 36
 Search warrants provide no substitute for probable cause. The Fourth Amendment states that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." Thus, although the standard of probable cause may in some cases be a flexible one as discussed below in connection with administrative inspections, the root concept of a search warrant is that it will provide a second level of protection, the interposition of the mediating judgment of a neutral and detached magistrate, to bolster the basic protection of requiring probable cause to justify an intrusion on Fourth Amendment interests.[9] See United States v. United States District Court, 1972, 407 U.S. 297, 316, 92 S.Ct. 2125, 32 L.Ed.2d 752.
 
 
 37
 The warrant before us fails to provide either level of protection. As already noted, the warrant is not based on any probable cause or even founded suspicion focussed on any particular individual or vehicle. Nor does the warrant interpose the mediating judgment of a magistrate because the warrant is a blanket authorization for border patrol agents to stop all cars and to detain for interrogation certain cars at their discretion. They, not the magistrate, make the decision. As the Supreme Court noted in Aguilar v. Texas, 1964, 378 U.S. 108, 111, 84 S.Ct. 1509, 1512, 12 L.Ed.2d 723:
 
 
 38
 Although the reviewing court will pay substantial deference to judicial determinations of probable cause, the court must still insist that the magistrate perform his "neutral and detached" function and not serve merely as a rubber stamp for the police.
 
 
 39
 Here the magistrate has not performed his "neutral and detached" function. He could not possibly be more than a rubber stamp. Because the warrant delegates too much discretion to border patrol agents who may, under the warrant, detain anyone driving north on the highway, the intrusion is not buffered by the specific mediating judgment of a magistrate. Nor is the warrant saved by its authorization to stop all traffic. Absent founded suspicion, that too is unreasonable. In short, we can find no justification in established Fourth Amendment principles for the area warrant checkpoint system.
 
 
 40
 III. The administrative inspection doctrine does not justify checkpoint stops under an area warrant.
 
 
 41
 Even though the checkpoint stops do not satisfy the traditional criteria of constitutionally reasonable seizures and searches, the government argues that the administrative inspection doctrine should be extended to permit checkpoint operations under generalized area warrants like the one now before us.[10] We recognize that the seeds of this argument were sown by Mr. Justice Powell in his concurrence in Almeida-Sanchez, but we nevertheless reject the proposed analogy to the administrative inspection cases.
 
 
 42
 A. The administrative inspection analogy is inapposite.
 
 
 43
 In Almeida the government attempted to justify its roving patrol searches under the administrative inspection doctrine. However, the Court, including Justice Powell, found Colonnade Catering Corp. v. United States, 1970, 397 U.S. 72, 90 S.Ct. 774, 25 L.Ed.2d 60, and United States v. Biswell, 1972, 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87, inapposite because they approved warrantless administrative inspections of commercial enterprises engaged in businesses, the sale of liquor and guns respectively, which were closely regulated by the government. Similarly the Court, including Justice Powell, found Camara v. Municipal Court, 1967, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930, and See v. City of Seattle, 1967, 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943, of no avail because in those cases the Court said that it would uphold administrative inspections to enforce community health and welfare regulations where made under a warrant supported by particular physical and demographic characteristics of the area to be searched.
 
 
 44
 However, Justice Powell saw in the latter two cases an analogy to the problem of enforcing the immigration laws in a border area (emphasis ours 413 U.S. at 281, 93 S.Ct. 2535) that led him to postulate the existence of a "functional equivalent of probable cause" that might justify a roving patrol search.[11] The government argued in Almeida that roving patrol checks of automobiles were the only feasible means of apprehending "illegal" aliens who crossed the border surreptitiously.[12] Recognizing the seriousness and legitimacy of the law enforcement problem and the necessity of safeguarding Fourth Amendment interests, Justice Powell proposed a resolution to balance these two contending forces.
 
 
 45
 By analogy to Camara, Justice Powell hypothesized a functional equivalent of probable cause for roving searches based on (1) a long history of judicial and public acceptance of the type of search; (2) the need to conduct such a search given the absence of alternatives for vindicating the public interest; and (3) the limited invasion of privacy occasioned by inspections which are "neither personal in nature nor aimed at the discovery of evidence of crime." 413 U.S. at 278, 93 S.Ct. at 2542. Camara, supra, 387 U.S. at 537, 87 S.Ct. 1727. Justice Powell found the first two criteria satisfied in the roving patrol context.[13] However, because roving patrol searches, and checkpoint operations for that matter, are both personal and crime-investigative, Justice Powell abstracted the broader criterion of a limited invasion of privacy. Finding support in the facts that roving patrols, though not border searches per se, were "incidental to the protection of the border" and that they involved searches of automobiles rather than persons or buildings, Justice Powell concluded that roving patrols can be considered a modest intrusion on Fourth Amendment interests, 413 U.S. at 279, 93 S.Ct. 2535. He thus concluded that there exists a constitutionally adequate equivalent of probable cause for roving vehicular searches in border areas.
 
 
 46
 Given an adequate equivalent of probable cause, Justice Powell would validate roving patrol searches if they are judicially authorized in advance by an appropriately drawn "area warrant." Conceding that the standards defining cause for issuance of such unprecedented area warrants are relatively unstructured, Justice Powell proposed four relevant factors:
 
 
 47
 (i) the frequency with which aliens illegally in the country are known or reasonably believed to be transported within a particular area; (ii) the proximity of the area in question to the border; (iii) the extensiveness and geographic characteristics of the area, including the roads therein and the extent of their use (footnote omitted) and (iv) the probable degree of interference with the rights of innocent persons, taking into account the scope of the proposed search, its duration, and the concentration of illegal alien traffic in relation to the general traffic of the road or area.
 
 
 48
 413 U.S. at 283-84, 93 S.Ct. at 2545.
 
 
 49
 Were we to accept Justice Powell's premise that an appropriately drawn area warrant would justify a roving patrol, and the government's corollary that an appropriately drawn area warrant would justify a fixed checkpoint, we would still conclude on the facts of the cases now before us that Justice Powell's proposed standards are not satisfied here.[14] However, we conclude that Justice Powell's premise and the government's corollary themselves are unsatisfactory.
 
 
 50
 We cannot accept the notion that an area warrant can constitutionally authorize immigration checkpoint operations in the interior of the United States because we think that the analogy to the administrative inspection cases is inapt and because we think that the concept of an area warrant, under these circumstances, is contrary to certain fundamental precepts of the Fourth Amendment, as revealed by its antecedent history.
 
 
 51
 What troubles us most about the administrative inspection analogy, proposed by Justice Powell for roving patrols in border areas and now urged by the government for fixed checkpoints, is the government's suggestion that somehow the asserted need to conduct such immigration seizures and searches establishes adequate cause to disrupt the normal flow of traffic on a major highway. The notion that law enforcement needs alone justify such intrusions was put to rest by the majority in Almeida:
 
 
 52
 It is not enough to argue, as does the Government, that the problem of deterring unlawful entry by aliens across long expanses of national boundaries is a serious one. The needs of law enforcement stand in constant tension with the Constitution's protections of the individual against certain exercises of official power. It is precisely the predictability of these pressures that counsels a resolute loyalty to constitutional safeguards.
 
 
 53
 413 U.S. at 273, 93 S.Ct. at 2540. Under Camara, to be sure, the absence of workable alternatives, coupled with a comparatively unobtrusive regulatory inspection, may render such an inspection constitutionally reasonable if conducted under a suitable area warrant. However, Camara was a different case from the ones now before us in just two crucial respects.
 
 
 54
 First, there was no doubt in Camara that the only way to discover certain dilapidations that violated the housing codes, such as faulty internal wiring, was to conduct routine periodic building inspections. 387 U.S. at 535-37, 87 S.Ct. 1727. In contrast, the influx of illegal aliens could conceivably be stemmed in various ways. It is not our business to tell the executive how to enforce the laws, nor to tell the Congress what laws to enact. But when, as in this case, the government chooses to pitch its case upon an alleged unavoidable necessity if the laws are to be successfully enforced, we feel compelled to comment on the claimed necessity.
 
 
 55
 Efforts at the border to repel aliens who attempt entry by stealth and subterfuge can, given additional manpower, be intensified. We note that given the present border patrol manpower, there are simply two few fingers to plug the many leaks in the dike, and we do not underestimate the cost of intensifying the "line watch" patrols on the physical border. Nonetheless, the mere fact that protecting a constitutional right will impose a heavy burden on the federal fisc is not a proper ground for our failing to protect that right. Checkpoint operations "must meet constitutional standards regardless of their utility in carrying forward the difficult mission of the Border Patrol." Bowen, supra, 500 F.2d at 963.
 
 
 56
 Nor are the government's alternatives exhausted with intensifying the line watch. The major forces that bring aliens to this country from Mexico are economic. Here they can get jobs, and jobs at higher wages than they can earn at home. At the same time, and because they are in this country illegally, they cannot complain about the working conditions or wages on the jobs that they obtain in this country. This produces an almost irresistible economic incentive to American employers to employ them. They are cheap and docile labor. We know that in many cases the terms and conditions under which they are employed are deplorable. In this respect they compete, and compete unfairly, with American labor. Congress could, if it would, neutralize these forces by imposing sanctions on employers who hire "illegal" aliens.[15]
 
 
 57
 There are other actions that might be taken. The I-151, or "green card" program, and the I-186 temporary border pass card program could be eliminated. Congress could require that every alien entering from Mexico have a valid passport and entry visa. This might interrupt or reduce the extensive shopping that card holders now do in American border cities, but it is an alternative open to the Congress if it finds the "illegal" alien problem as serious as government counsel tells us that it is.
 
 
 58
 So, too, the Congress could abolish the alien "commuter" system, which is an obvious subterfuge, that was before the Court in Saxbe v. Bustos, 1974, 419 U.S. 65, 95 S.Ct. 272, 42 L.Ed.2d 231. See Note, Bustos v. Mitchell (Saxbe v. Bustos): The Dilemma of Commuting Alien Laborers, 5 Calif.West.Int'l L.J. 184 (1974). We do not purport to have explored other possibilities. We mention the foregoing only because the government is here claiming "necessity" as a reason for abandoning constitutional protections. We are not persuaded by the government's argument that operation of the San Clemente checkpoint, and others like it, is the only way to deter the entry of "illegal" aliens from Mexico. This is not to say, we repeat for emphasis, that even if it were the only way, it would be constitutionally permissible.
 
 
 59
 Moreover, the inspection authorized in Camara was not in the nature of a criminal investigation. There the Court distinguished the administrative inspection for housing code violations, for which an area warrant could issue on less than probable cause to believe that a particular dwelling violated the minimum standards, from a search in a criminal investigation.
 
 
 60
 In cases in which the Fourth Amendment requires that a warrant to search be obtained, "probable cause" is the standard by which a particular decision to search is tested against the constitutional mandate of reasonableness. To apply this standard, it is obviously necessary first to focus upon the governmental interest which allegedly justifies official intrusion upon the constitutionally protected interests of the private citizen. For example, in a criminal investigation, the police may undertake to recover specific stolen or contraband goods. But that public interest would hardly justify a sweeping search of an entire city conducted in the hope that these goods might be found. Consequently, a search for these goods, even with a warrant, is "reasonable" only when there is "probable cause" to believe that they will be uncovered in a particular dwelling.
 
 
 61
 Unlike the search pursuant to a criminal investigation, the inspection programs at issue here are aimed at securing city-wide compliance with minimum physical standards for private property. The primary government interest at stake is to prevent even the unintentional development of conditions which are hazardous to public health and safety. . . .
 
 
 62
 . . . (B)ecause the inspections are neither personal in nature nor aimed at the discovery of evidence of crime, they involve a relatively limited invasion of the urban citizen's privacy. 387 U.S. at 534-35, 537, 87 S.Ct. at 1734.
 
 
 63
 That the border patrol checkpoint operations are both personal in nature and aimed at the discovery of evidence of a crime is beyond dispute. Inherent in the government's argument here, and in its argument in Almeida (413 U.S. at 278, 93 S.Ct. 2535 (Powell, J., concurring)), is the fallacy that its practice of simply deporting aliens rather than prosecuting them gives its operations a quasi-administrative aspect. Although most aliens are simply deported, it is nonetheless true that the government does seek to prosecute virtually all smugglers of illegal aliens. Baca, R.T. 462-65. See Baca, supra, 368 F.Supp. at 406 ("particular attention" paid to smuggling operations). Furthermore, border patrol agents are armed with service revolvers. Baca R.T. 255, 289. They are law enforcement officers and cannot rationally be viewed as administrative personnel. Id. at 256. The very facts of the three appeals now before us attest to their criminal law enforcement duties and activities. The checkpoints perform primarily crime-investigative rather than administrative functions.
 
 
 64
 Precisely because the checkpoint operations are part of a crime investigation scheme rather than a regulatory scheme, we think what Mr. Justice Clark said in his dissent to Camara and See with respect to the administrative inspection warrants there approved applies to the San Clemente checkpoint warrant of inspection. It sets up "a newfangled 'warrant' system that is entirely foreign to Fourth Amendment standards." 387 U.S. at 547, 87 S.Ct. at 1741.
 
 
 65
 The San Clemente warrant of inspection is an area or general warrant with many of the objectionable features of the "infamous" writs of assistance which were anathema to the colonists of Massachusetts in 1761.[16] The writs of assistance were warrants empowering British customs officials and their deputies to search at will in the port of Boston wherever they suspected that they might find imported goods on which no customs duty had been paid, and to break open receptacles or packages suspected of containing such smuggled goods. N. Lasson, History and Development of the Fourth Amendment to the United States Constitution 54 (1937). See generally Horace Gray, Writs of Assistance contained in Appendix I to Quincy's Massachusetts Reports 1761-1772.
 
 
 66
 The primary vices of the writs of assistance, and their precursors, the general writs originating with the Court of Star Chamber, were (1) that the warrants could be issued without sufficient cause; (2) that persons and places were not particularly specified; and (3) that the warrants left too much to the discretion of the bearer. Lasson, supra, at 26. Even before the writs of assistance controversy, Sir Matthew Hale, Lord Chief Justice of the Court of King's Bench from 1671 to 1676, had denounced both blank warrants to apprehend all persons suspected of having committed a given crime and general warrants to search any suspected place for stolen goods. Presaging modern constitutional principles, Hale insisted that valid warrants must specify with particularity the person to be seized or the place to be searched and must establish probable cause therefor to the satisfaction of a magistrate. Sir Matthew Hale, History of the Pleas of the Crown, vol. I at 576-77, 580, vol. II at 110, 112-14, 149-51 (1736). See also Lasson, supra, at 35-36.
 
 
 67
 Articulating his objections to the general warrants in his treatise, Hale wrote:
 
 
 68
 (T)hese warrants are judicial acts, and must be granted upon examination of the fact. And therefore, I take those general warrants dormant, which are made many times before any felony committed, are not justifiable, for it makes the party to be in effect the judge; and therefore searches made by pretense of such general warrants give no more power to the officer or party, than what they may do by law without them. II Hale, supra, at 150.
 
 
 69
 In retrospect, the United States Supreme Court has noted that the writs of assistance issued in Massachusetts in 1761 were considered " 'the worst instrument of arbitrary power, the most destructive of English liberty, and the fundamental principles of law, that ever was found in an English law book;' since they placed 'the liberty of every man in the hands of every petty officer.' " Boyd v. United States, 1886, 116 U.S. 616, 625, 6 S.Ct. 524, 529, 29 L.Ed. 746.[17]
 
 
 70
 The unmistakably parallel vice of the inspection warrant for the San Clemente checkpoint is that, without having issued on probable cause or even founded suspicion focussed on any particular person or vehicle, the warrant purports to authorize agents to do that which they clearly could not do without the warrant: namely, to stop vehicles without cause or founded suspicion. The warrant purports to delegate to the border patrol agent on the "point" the unfettered discretion to stop any or all cars and to divert them for detention and questioning at secondary. This, we conclude, such a warrant cannot constitutionally do. Cf. Bowen, supra, 500 F.2d at 963-64. The antecedent history of the Fourth Amendment teaches us the dangers of giving judicial sanction to a general area warrant, particularly when it is used for criminal investigative purposes. Like the writs of assistance used to enforce the British colonial customs system, the present day border patrol checkpoints and area warrant partake too much of "burning a barn to roast an egg." Lasson, supra, at 68 n. 60.
 
 
 71
 B. This inspection warrant would be invalid even under the administrative inspection analogy.
 
 
 72
 Even if we agreed with the government that the proper accommodation of law enforcement needs and Fourth Amendment protections would be to permit immigration checkpoints under judicially approved area warrants, we would conclude that the San Clemente checkpoint does not meet the standards sketched by Justice Powell in his concurrence in Almeida.
 
 
 73
 First, the frequency with which illegal aliens pass through the San Clemente checkpoint is far too low to make operation of a checkpoint reasonable. During the effective period of the warrant of inspection, only 0.12 percent of the passing cars were found to contain "illegal" aliens. Other considerations aside, that miniscule fraction alone would render the checkpoint operation unreasonable.
 
 
 74
 Second, the San Clemente checkpoint is 66 miles from the border. Surely, Justice Powell envisioned roving patrols much nearer the border. In any event, we think 66 miles is too far away, particularly where the checkpoint is located on an interstate highway which is the major traffic artery between the two largest cities in California, an artery that carries many million cars each year.
 
 
 75
 Third, although we are not sure how to weigh the "extensiveness and geographic characteristics of the area" because the San Clemente inspection warrant is narrowly limited to a fixed point along the highway, we note that Justice Powell's explanation of this factor used examples which reinforce our conclusion that he contemplated searches very near the border:
 
 
 76
 Depending upon the circumstances, there may be probable cause for the search to be authorized only for a designated portion of a particular road or such cause may exist for a designated area which may contain one or more roads or tracks. Particularly along much of the Mexican border, there are vast areas of uninhabited desert and arid land which are traversed by few, if any, main roads or highways, but which nevertheless may afford opportunities by virtue of their isolated character for the smuggling of aliens. 413 U.S. at 284 n. 4, 93 S.Ct. at 2545 (emphasis added).
 
 
 77
 Accordingly, we conclude that geographic characteristics are relevant only to establish an essential nexus with the border. Here there was none.
 
 
 78
 Fourth, the probable, indeed actual, degree of interference with the rights of innocent persons at the checkpoint is intolerable. Roughly 999 of every 1000 cars passing the checkpoint carry only persons who are lawfully within the country and under Carroll, supra, are "entitled to use the public highways (and) have a right to free passage without interruption." Although the duration of a stop and even a detention for immigration questioning may be brief, the concentration of illegal alien traffic in relation to the general traffic on the highway is too small. We cannot countenance the cumulative intrusion of stopping ten million cars per year where only one out of every 1000 passing cars may contain aliens illegally within the country.
 
 
 79
 In short, if Justice Powell's Almeida concurrence were our guide, we would conclude that the United States magistrate who issued the instant warrant of inspection for San Clemente erred in resolving what Justice Powell calls a "delicate question of constitutional judgment." 413 U.S. at 284, 93 S.Ct. 2535.
 
 
 80
 IV. Conclusion.
 
 
 81
 Because we hold the checkpoint operations under the warrant of inspection constitutionally unreasonable,[18] the evidence obtained as a result of the traffic check in each case should have been suppressed. Wong Sun v. United States, 1963, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441; United States v. Juarez-Rodriguez, 9 Cir., 1974, 498 F.2d 7. Accordingly we reverse the conviction in No. 74-2462 and affirm the orders of suppression in Nos. 74-2680 and 74-2714.
 
 JAMES M. CARTER, Circuit Judge (dissenting):
 
 82
 Judge Duniway correctly states the limited issues presented by the above appeals, viz. (1) the legality of the stop and diversion of the vehicles to the secondary inspection area, and (2) the legality of the interrogation of the occupants. In Guillen, the two defendants were riding in the front seat. Four aliens were found by a search of the trunk. Interrogation of these four aliens showed their illegal status and that one of the defendants, Medrano-Barragan, was also an illegal alien. Our record does not disclose whether the search of the trunk was based on consent or on probable cause because of the presence of an illegal alien in the front seat or on Section 3 of the warrant: "To conduct routine inspection of the vehicles for the presence of aliens."
 
 
 83
 In Martinez-Fuerte and Jiminez-Garcia, there was only the stop, diversion and interrogation.
 
 
 84
 Judge Duniway, as shown by notes 1 and 3, does not reach the question of the search in Guillen. I would, as discussed infra, uphold the stop, diversion and interrogation in all three cases but remand Guillen for findings as to the basis of the search, i. e., whether consent, probable cause or the terms of the warrant, and whether the testimony of the aliens found in the trunk was admissible.
 
 
 85
 The most interesting aspect of the majority opinion is its references to Justice Powell's concurrence in Almeida-Sanchez. The opinion reads as if Justice Powell stood alone in his views as to the validity of an area warrant. Whether or not Justice Powell was correct in his views is one question, but a breakdown of the votes in Almeida-Sanchez indicates that his views were supported by a majority of the Court. We concede that Justice Powell's concurrence did not involve fixed checkpoints.
 
 
 86
 In his dissent in Almeida-Sanchez, Justice White (joined by the Chief Justice, Justice Blackmun and Justice Rehnquist) stated:
 
 
 87
 ". . . Justice Powell, would uphold searches by roving patrols if authorized by an area warrant issued on less than probable cause in the traditional sense. I agree with Mr. Justice Powell that such a warrant so issued would satisfy the Fourth Amendment . . ." 413 U.S. at 288, 93 S.Ct. at 2547. (Emphasis added).
 
 
 88
 Thus five Justices are on record in support of the validity of area search warrants executed by roving patrols.
 
 
 89
 Justice Stewart stated: "The Justices who join this opinion (Douglas, Brennan, Marshall and Powell) are divided upon the question of the constitutionality of area search warrants such as described in Mr. Justice Powell's concurring opinion." Id. at 270 n. 3, 93 S.Ct. at 2538. I speculate that had only Justice Powell been of the view expressed, the footnote would have been unnecessary.
 
 
 90
 I conclude that Justice Powell's concurrence in Almeida-Sanchez, when read together with Justice White's dissent, supports the legality of the stop, limited visual inspection, and occasional interrogation of motorists at a fixed checkpoint, pursuant to a warrant issued by a "neutral and detached magistrate" involved in these cases.
 
 
 91
 The four dissenters in Almeida-Sanchez would have upheld a warrantless search by roving patrols on less than probable cause. Clearly, they would uphold a fixed checkpoint procedure pursuant to a "checkpoint" warrant. If Justice Powell would uphold the present warrant, the necessary majority would be created. Without repeating it here, I rely generally on the analysis of the issue by Justice Powell for my dissent. I comment briefly.
 
 
 92
 Justice Powell recognized the need for traffic checking operations removed from the physical boundary line, and that stops and searches on less than probable cause could be constitutionally conducted:
 
 
 93
 "The conjunction of these factors consistent judicial approval, absence of a reasonable alternative for the solution of a serious problem, and only a modest intrusion on those whose automobiles are searched persuades me that under appropriate limiting circumstances there may exist a constitutionally adequate equivalent of probable cause to conduct roving vehicular searches in border areas." Id. at 279, 93 S.Ct. at 2542. (emphasis added).
 
 
 94
 The four factors suggested by Justice Powell as relevant to determining the validity of warrants such as the one involved in the present cases are noted at p. 16 of the majority's opinion.
 
 
 95
 Although 68 miles from the border would seem to be too far to qualify under Justice Powell's second factor, a number of considerations demonstrate that the San Clemente checkpoint is in fact reasonable. First, in requiring proximity to the border, Justice Powell was referring to roving patrols in a rural, unlighted area. If people could be stopped at any time by roving patrol cars, without any notice, then clearly the area in which such stops could occur should be limited to an area quite close to the border, where very few residences or travelers could be found. The same purpose is achieved, however, by a fixed checkpoint which limits the area of possible search to a small, permanent portion of a single road. The checkpoint is lighted. There is abundant notice, most cars need only slow down, there are no houses, etc. In other words the fixed San Clemente checkpoint is less intrusive than roving patrols in a relatively unpopulated area close to the border.
 
 
 96
 Secondly, Justice Powell referred to "roving vehicular searches." (Emphasis supplied). No search is involved in two of our cases only a stop and interrogation. In all three cases the interrogation revealed the alien status of either the driver or the passengers, or both. The majority in our case limits its holding to stops, diversion and interrogation. See notes 1 and 3.
 
 
 97
 Nor is the inconvenience or invasion of privacy (Justice Powell's fourth relevant factor) unreasonable. With respect to the vast majority of motorists passing through the various checkpoints maintained by the Government, a visual inspection is performed without the necessity of more than a temporary slowdown of traffic. Baca, supra, 368 F.Supp. at 406-407.
 
 
 98
 The majority states that it "cannot countenance the cumulative intrusion of stopping ten million cars per year where only one out of every 1,000 passing cars may contain aliens illegally within the country." I cannot accept this description of the procedures at the San Clemente checkpoint. As indicated supra, most cars are never even stopped. Rather, "(i)f the agent does not have reason to believe that the vehicle approaching the checkpoint is carrying aliens, he may exchange salutations, or merely wave the vehicle through the checkpoint." Baca, supra, at 406-407. From the record in Baca, on the basis of which the present warrant was issued, it would be more reasonable to conclude that only the 820 cars directed to secondary were stopped during the nine-day warrant period instead of the 145,960 suggested by the majority.
 
 
 99
 The majority, in footnote 7, cites the case of United States v. Evans, 507 F.2d 879 (9 Cir. 1974) and states: "We have recently held that mere diversion of a moving automobile through a zone (a traffic checkpoint) where border patrol agents could see in plain view two aliens lying on the floor behind the front seat does not violate any constitutionally protected expectation of the right of privacy."
 
 
 100
 Surely, if a diversion of a car through a checkpoint was not illegal, the slowing of cars at a checkpoint would also not be illegal.[1]
 
 
 101
 The majority makes much of the inconvenience to travelers who passed through checkpoints but were not diverted for interrogation or inspection. The slowing of the 145,410 cars during the nine-day period of the warrant in question was not unreasonable under constitutional provisions.
 
 
 102
 With respect to Justice Powell's first relevant factor, the court below found, and the Government makes a strong factual showing, that illegal aliens are frequently transported to Los Angeles and farther north via Interstate 5. Amicus Curiae calculated that 319,000 illegal aliens pass through the checkpoint each year. Even though very few actual stops were made by the agents (only 820 of 145,960 vehicles during the nine days of the warrant), during 1973, 16,863 deportable aliens were apprehended at the checkpoint and the number deterred is inestimable.
 
 
 103
 I question the majority's statistics and percentages on this point. The opinion states at p. 8 that "border patrol statistics reveal that of the 145,960 vehicles passing through the checkpoint, only 171, or 0.12 percent, were found to contain deportable aliens." Since all but 820 of the vehicles passed through without a "stop" or inquiry, however, aliens were found to be present in about 21 percent of the vehicles stopped (171 out of 820). Further, in only 202 of the 820 vehicles referred to "secondary" for questioning was there any interrogation or inspection. Of those 202 vehicles, 171 contained illegal aliens in 169 (84 percent) the aliens were in plain view.
 
 
 104
 Thus, as the degree of intrusion and inconvenience increases, so also does the likelihood of discovering illegal aliens in plain view. And this represents merely the "tip of the iceberg." In Baca, supra, the court found that:
 
 
 105
 "(w)hile a large number of apprehensions are made at the checkpoints each year, as related above, the primary reason for their operation is that they effectively deter large numbers of aliens from illegally entering the country or violating the terms of any temporary crossing card they may have, because they form an effective obstacle and are located on all major routes north out of the border region." 368 F.2d at 407.
 
 
 106
 In his Almeida-Sanchez concurrence, Justice Powell stated: "In short, the determination of whether a warrant should be issued for an area search involves a balancing of the legitimate interests of law enforcement with protected Fourth Amendment rights." 413 U.S. at 284, 93 S.Ct. at 2545. The warrant in these cases was very limited a ten-day duration, single designated place on a highway, small percentage of vehicles stopped, and smaller yet investigated. The warrant was issued following careful scrutinization of the factual basis by a neutral and detached magistrate. These facts demonstrate the reasonableness of the warrant. The Fourth Amendment and Almeida-Sanchez require no more.
 
 
 107
 In Martinez-Fuerte, I would affirm the conviction. In Jiminez-Garcia, I would reverse the order granting the motion to suppress and remand for trial. In Guillen, I would uphold the stop and diversion, but remand for findings concerning the subsequent search.
 
 
 108
 I would at least remand to the district court for consideration of this issue, regardless of the validity of the warrant in question.
 
 
 
 *
 The Honorable Stanley A. Weigel, United States District Judge for the Northern District of California, sitting by designation
 
 
 [1]
 It is not clear whether the inspection warrant purports to authorize searches beyond a mere "stop" and inquiry into the immigration status of the persons in the car. Presumably, however, in this case the agents either had obtained Guillen's consent to the search of the trunk or had probable cause to search based on the presence of two "illegal" aliens in the passenger area of the car. We need not decide that issue, however, because the parties rest their cases on the validity vel non of the stop made under the inspection warrant
 
 
 [2]
 
 TO: Any authorized officer of the Immigration and Naturalization Service including any agent of the U.S. Border Patrol:
 Application having been made by the United States for a warrant of inspection for the operation of a fixed checkpoint at San Clemente, California, and having reviewed and considered the affidavits of Robert D. McCord and Richard Wischkaemper, and having reviewed and considered the findings made by the United States District Court in United States v. Baca, 368 F.Supp. 398 (S.D.Cal.1973) and having reviewed and considered a copy of the certified reporter's transcript of the sworn testimony of Deputy Chief Border Patrol Agent Richard E. Batchelor presented in the Baca case,
 I am satisfied that there is probable cause to believe that mass violations of the Immigration laws of the United States (Title 8, United States Code) have been and are being committed at a point known as the Border Patrol checkpoint on the northbound lanes of Interstate Highway Route 5, approximately five miles south of San Clemente, California.
 Wherefore, You are Hereby Commanded:
 (1) to conduct an immigration traffic checkpoint on the northbound lanes of Interstate Route 5, five miles south of San Clemente, California, and;
 (2) to stop northbound motor vehicles for the purpose of making routine inquiries to determine the nationality and/or immigration status of the occupants of said vehicles, and;
 (3) to conduct a routine inspection of said vehicles for the presence of aliens, and;
 (4) since the flow of alien traffic occurs at all hours of the day, and since limited operation of the traffic checkpoint would tend to defeat its purpose, the operation of this checkpoint may be conducted at any time of day or night, and;
 (5) a copy of the warrant shall be displayed in a conspicuous manner at the checkpoint location and upon request, shall be given to any person detained.
 (6) The Immigration and Naturalization Service shall file a written return on this warrant containing the following:
 A. The approximate number of vehicles passing through the checkpoint during the hours of operation;
 B. The approximate number of vehicles stopped for questioning concerning citizenship status;
 C. The number of vehicles inspected;
 D. The number of vehicles in which aliens were discovered;
 E. A recapitulation of the total number of deportable aliens apprehended;
 F. An inventory of any property seized.
 (7) This warrant shall be returned within ten days of this date, as required by law.
 Dated this 22nd day of June, 1974.
 /s/ Edward A. Infante United States Magistrate
 
 
 [3]
 Paragraph (3) of the warrant purports to authorize agents "to conduct a routine inspection of said vehicles for the presence of aliens." In the jargon of the border patrol "inspection" is often a euphemism for search (see the reporter's transcript in the Baca case referred to in the warrant at 202-08, 331-32), and the government presumes that paragraph (3) would authorize searches of trunks and other places where aliens could be concealed (government's brief in No. 74-2462 at 43). However, the government asserts that no search of an automobile interior was conducted under this warrant without the driver's consent. In any event, in each of the appeals now before us, the border patrol discovered aliens without going beyond the "routine inquiry" authorized by paragraph (2), and we are not directly concerned with paragraph (3), although it is true that in No. 74-2714 the trunk of Guillen's car was opened after two "illegal" aliens were discovered in the passenger area. We assume that that discovery gave probable cause to search the trunk. But if the discovery violated the Fourth Amendment, the later search can fare no better. In view of our holding that paragraphs (1) and (2) contravene the Fourth Amendment, we do not consider any argument that the warrant is invalid because paragraph (3) is too broadly drawn. We do note, though, that later renewals of the warrant deleted the authority to "inspect" and limited agents to the stop and inquiry procedure. E. g., Warrants of the District Court for the Southern District of California Nos. 408, July 11, 1974, and 420, July 29, 1974
 
 
 [4]
 Hereafter cited as "Baca R.T."
 
 
 [5]
 E. g., United States v. Morgan, 9 Cir., in banc, 1974, 501 F.2d 1351; United States v. Brignoni-Ponce, 9 Cir., in banc, 1974, 499 F.2d 1109; United States v. Juarez-Rodriguez, 9 Cir., 1974, 498 F.2d 7
 
 
 [6]
 The border patrol does, however, maintain a 24 hour check on all buses passing through the checkpoint to ascertain the citizenship of the passengers. Baca R.T. 187. The validity of this procedure is not before us. Furthermore, the border patrol frequently maintains a traffic observation post with agents positioned in a car along the road to look for suspicious vehicles when the checkpoint is closed. Id. at 372. See, e. g., Brignoni-Ponce, supra
 
 
 [7]
 We have recently held that mere diversion of a moving automobile through a zone (a traffic checkpoint) where border patrol agents could see in plain view two aliens lying on the floor behind the front seat does not violate any constitutionally protected expectation of privacy. United States v. Evans, 9 Cir., 1974, 507 F.2d 879. Evans did not involve a stop and did not, therefore, address the constitutionality of the stop, detention, and inquiry procedure at issue here
 
 
 [8]
 The government tenaciously maintains that 8 U.S.C. § 1357(a) and 8 C.F.R. § 287.1 authorize its checkpoint operations, but that argument is foreclosed by Almeida, Bowen, and Brignoni, supra
 
 
 [9]
 We recognize, of course, that there are well established exceptions to the warrant requirement, for example, where exigent circumstances make obtaining a warrant infeasible. E. g., Chambers v. Maroney, 1970, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419; Carroll v. United States, 1925, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed.2d 543
 
 
 [10]
 In Bowen we declined to express an opinion on the validity of such then hypothetical area warrants. 500 F.2d at 967. They are no longer hypothetical
 
 
 [11]
 It bears emphasis that neither the majority opinion in Almeida nor Justice Powell's concurrence dealt with fixed checkpoints. Both addressed only roving patrol searches near the border. It does not necessarily follow that Justice Powell would approve of area warrants for checkpoints distant from the border
 
 
 [12]
 Almeida, supra, 413 U.S. at 276, 93 S.Ct. 2535 (Powell, J., concurring). We cannot ignore the irony in the government's present argument that the only effective way to apprehend aliens who have surreptitiously entered is to conduct fixed traffic checkpoints
 
 
 [13]
 Whether roving patrols, or checkpoints, have enjoyed a history of acceptance comparable in length to that of the building inspections involved in Camara is open to debate. For an argument that they have not, see Note, Area Search Warrants in Border Zones: Almeida-Sanchez and Camara, 84 Yale L.J. 355, 361-62 (1974). We do not pause to enter that debate because we find the other two criteria unsatisfied. For other recent law review commentary on area warrants in border cases, see Leahy, Border Patrol Checkpoint Operation under Warrant of Inspection: The Wake of Almeida-Sanchez v. United States, 5 Calif.West.Int'l L.J. 62 (1974); Note, The Aftermath of Almeida-Sanchez v. United States: Automobile Searches for Aliens Take on a New Look, 10 Calif.West.L.Rev. 657 (1974)
 
 
 [14]
 See discussion below in part III, B of this opinion
 
 
 [15]
 We take judicial notice of just such a legislative proposal made in the "Rodino Bill," H.R. 982, 93d Cong., 1st Sess. (1973), which passed the House of Representatives on May 3, 1973, 119 Cong.Rec.No.67 at H 3332 (May 3, 1973). The Senate has never acted on it. See 2 CCH Cong.Index, 93d Cong. 5054 (1973-74)
 
 
 [16]
 The controversy over those writs was "the first in the chain of events which led directly and irresistibly to revolution and independence." N. Lasson, History and Development of the Fourth Amendment to the United States Constitution 51 (1937). See also Frank v. Maryland, 1959, 359 U.S. 360, 364, 79 S.Ct. 804, 3 L.Ed.2d 877
 
 
 [17]
 While writs of assistance stirred controversy in colonial America, general warrants were also the subject of judicial condemnation in England in the "General Warrant Cases." Leach v. Money, 1765, 19 St.Tr. 1002 (general warrant to arrest unnamed persons against whom a charge had not yet been formulated held illegal); Wilkes v. Wood, 1763, 19 St.Tr. 1153 (papers of an unnamed person could not be seized on a general warrant); Entick v. Carrington, 1765, 19 St.Tr. 1030 (general warrant for seizure of papers of named persons held illegal). See generally Wade and Phillips' Constitutional Law 366-67 (5th ed. 1955)
 
 
 [18]
 Because we hold the inspection warrant procedure itself constitutionally infirm and therefore beyond the authority of any judicial officer, we need not consider the additional argument that a United States magistrate (as opposed to a judge) is not empowered to issue such warrants. We add, however, that we perceive no distinction here between the powers of judges and those of magistrates. By statute, 28 U.S.C. § 636(a)(1), magistrates have all powers conferred upon Commissioners by the Federal Rules of Criminal Procedure, which include the authority to issue both arrest and search warrants under Rules 4 and 41. The term "magistrate" used in those rules includes both federal magistrates and federal judges. Rule 54(c). We see nothing in the rules that might allow a judge but not a magistrate to issue an inspection warrant
 
 
 [1]
 At least two circuits have upheld stops at fixed checkpoints for the purpose of making routine inquiries as to the nationality of the occupants even without a warrant. United States v. Hart, 506 F.2d 887, 16 Cr.L. 2382 (5 Cir. 1975) ("A permanent checkpoint does not have the constitutionally frightening aspect of a roving patrol"); United States v. Bowman, 487 F.2d 1229 (10 Cir. 1973)